# EXHIBIT "H"

# TRANSMITTAL

**Simon Construction Group**
225 West Washington Street, 9th Fl.
Indianapolis, IN 46204
Telephone: (317) 263-7101 / Fax: (317) 263-2333



DATE:   May 4, 2021

TO:   Scott P. Scungio, Principal
      **SCUNGIO BORST & ASSOCIATES**
      One Port Center
      2 Riverside Drive
      Suite 500
      Camden, New Jersey 08103

TELEPHONE:   856/757-0100

VIA:   U.S. Mail

RE:   MENLO PARK MALL - TRUE FOOD KITCHEN AND SHAKE SHACK
      Edison, New Jersey
      #4666

**We are sending you:**   ☒ Attached   ☐ Under Separate Cover

☐ Shop Drawings   ☐ Samples   ☐ Prints   ☐ Plans

☐ Copy of Letter   ☐ Change Order   ☐ Specifications   ☒ Other

| Copies | Date | No. | Description |
|---|---|---|---|
| 1 | 4/7/21 | GC-2 | Fully executed Agreement Between Owner and Contractor (Lump Sum) in the amount of $3,596,101.00 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**Items Transmitted as Checked Below:**

☐ For Approval   ☐ Approved As Submitted   ☐ For Signature

☒ For Your Use/Records   ☐ Approved As Noted   ☐ Resubmit _____ Copies for Approval

☒ As Requested   ☐ Returned for Corrections   ☐ Submit _____ Copies for Distribution

☐ For Review/Comment   ☐ For Bids Due   ☐ Return _____ Corrected Prints

**Remarks:**   N/A

Signed:   John L. Woods
          Specialty Retail Project Manager

JLW/mmb

cc:   Philip Borst, Principal, SCUNGIO BORST & ASSOCIATES
      4666 - SCUNGIO BORST & ASSOCIATES



# SIMON®

SPG PROJECT #4666

## AGREEMENT BETWEEN OWNER AND CONTRACTOR

AGREEMENT made as of    April 7, 2021

Between the "Owner":    Shopping Center Associates

Menlo Park Mall

100 Menlo Park, Suite 500

Edison, NJ 08837

and the "Contractor":    Scungio Borst & Associates

2 Riverside Drive, Suite 500

Camden, NJ 08103

for the "Project":    Redevelopment of Macaroni

Grill for True Food Kitchen and Shake Shack

The Owner and the Contractor agree as set forth below.

## Table of Contents

Article 1:  General Provisions .................................................................. 1
    1.1  Definitions ..................................................................... 1
    1.2  Interpretation ................................................................. 2
    1.3  Representatives .............................................................. 3
    1.4  Assignment ................................................................... 4
    1.5  No Waiver .................................................................... 4
    1.6  Notice ........................................................................ 4
    1.7  Confidentiality ............................................................... 4
    1.8  Business Ethics Standards ................................................... 4
    1.9  The Lender ................................................................... 5
    1.10  Diversity .................................................................... 5
    1.11 Counterparts ................................................................. 5

Article 2:  Intentionally Deleted

Article 3:  Construction ........................................................................ 5
    3.1  Construction Documents ...................................................... 5
    3.2  The Owner's Information ...................................................... 7
    3.3  General Duties ............................................................... 7
    3.4  Subcontractors ............................................................... 8
    3.5  Meetings and Reports ........................................................ 9
    3.6  Permits, Fees and Notices ................................................... 9
    3.7  Submittals ................................................................... 9
    3.8  Equipment and Materials .................................................... 10
    3.9  Site Access ................................................................. 10
    3.10  Cutting and Patching ...................................................... 10
    3.11  Clean-Up .................................................................. 10
    3.12  Temporary Facilities ...................................................... 10
    3.13  Uncovering of Work ....................................................... 10
    3.14  Correction of Work ........................................................ 10
    3.15  Warranty .................................................................. 11
    3.16  Record Drawings .......................................................... 11
    3.17  Close-Out Documents ...................................................... 12
    3.18  Indemnification ........................................................... 12
    3.19  Separate Contractors ...................................................... 12

Article 4:  The Contract Time ................................................................ 12
    4.1  The Project Schedule ........................................................ 12
    4.2  Delay Caused by Contractor ................................................. 13
    4.3  Delay to Contractor's Work .................................................. 13
    4.4  Work Suspension ............................................................ 14
    4.5  Substantial Completion ...................................................... 14
    4.6  Partial Occupancy ........................................................... 15

Article 5:  The Contract Sum ................................................................ 15
    5.1  Defined ..................................................................... 15
    5.2  Allowances .................................................................. 15
    5.3  Basis of Contract Sum ...................................................... 15

Article 6:  Payments ......................................................................... 17

6.1  Schedule of Values ................................................................ 17
6.2  Progress Payments ............................................................... 17
6.3  Payments to Subcontractors ................................................. 18
6.4  Payment Withholding ............................................................ 18
6.5  Final Payment ...................................................................... 18
6.6  Interest ................................................................................ 19

Article 7:  Changes ............................................................................ 19
7.1  Change Orders ..................................................................... 19
7.2  Change Order Proposals ....................................................... 20
7.3  Pricing ................................................................................. 20
7.4  Unit Price Change Order Proposals ....................................... 20
7.5  Cost Plus Change Order Proposals ........................................ 20
7.6  Subcontract Buy-Outs .......................................................... 21
7.7  Differing Site Conditions ...................................................... 21
7.8 Forms .................................................................................. 21

Article 8:  Safety .............................................................................. 21
8.1  Contractor Responsibility ..................................................... 21
8.2  Hazardous Conditions .......................................................... 22

Article 9:  Insurance ......................................................................... 22
9.1  Contractor's Liability Insurance ............................................. 22
9.2   Subcontractor's Insurance ................................................... 24
9.3  Builder's Risk Insurance ....................................................... 24
9.4  Recommendations of Insurers ............................................... 25

Article 10:  Disputes ......................................................................... 25
10.1  Claims ................................................................................ 25
10.2  Stepped Negotiation ........................................................... 25
10.3  Mediation ........................................................................... 25
10.4  Continued Performance ....................................................... 26

Article 11:  Remedies ........................................................................ 26
11.1  Default ............................................................................... 26
11.2  Bankruptcy .......................................................................... 26
11.3  Convenience Termination ..................................................... 26
11.4  Assignments ....................................................................... 27

Signatures  ...................................................................................... 27

<u>Attached Exhibits:</u>

Exhibit A:        Construction Documents

Exhibit B:        The Project Team

Exhibit C:        The Project Schedule

Exhibit D-1:    The Schedule of Values with Detail

Exhibit D-2:    Allowances

Exhibit D-3:    Global Risk Checklist

Exhibit E:        Sample Application for Payment, Lien Waiver Forms, and Contactor's Affidavit

Attachment 1: State-Specific Changes

**ARTICLE 1**
**GENERAL PROVISIONS**

1.1     Definitions.

1.1.1     The "Construction Documents" are the Plans and Specifications establishing the requirements of the Work to be performed by the Contractor.

1.1.2     The "Contract Documents" consist of this Agreement and the following documents:

.1          The Construction Documents identified in Exhibit A attached to this Agreement.

.2          The "Project Team" identified in Exhibit B attached to this Agreement.

.3          The "Project Schedule" attached to this Agreement as Exhibit C.

.4          The "Schedule of Values with Detail" attached to this Agreement as Exhibit D-1, Allowances attached to this Agreement as Exhibit D-2.

.5          Change Orders issued subsequent to the date of this Agreement.

.6          The following Addenda:  N/A

.7          Other Contract Documents: Gilligan & Bubnowski, Architects (11/20/19), Pennoni (10/04/19), Project Specifications (08/01/19) and Edison Restaurants – TFK and SS – Geotech Report (07/24/19)

1.1.3     "Day" means calendar day unless otherwise provided.

1.1.4     Intentionally Deleted.

1.1.5     "Hazardous Conditions" means any material, waste, substance or chemical deemed to be hazardous under applicable Legal Requirements, or the handling, storage, remediation, or disposal of which is regulated by applicable Legal Requirements.

1.1.6     "Legal Requirements" means all applicable federal, state and local laws, codes, ordinances, rules, regulations, orders and decrees of any governmental or quasi-governmental entity having jurisdiction over the Project or Site, the practices involved in the Project or Site, and the Work, including but not limited to the Occupational Safety and Health Act and the American's with Disabilities Act, as they apply to the Work.

1.1.7     Intentionally Deleted.

1.1.8     The "Plans" are the graphic and pictorial portions of the Construction Documents showing the design, location and dimensions of the Work, generally including drawings, elevations, sections, details, schedules, materials renderings, and diagrams.

1.1.9     "Scope Change" means Work directed by the Owner which is not reasonably inferable from the Construction Documents, and is (1) materially inconsistent with such documents, or (2) a material change in the quantity, quality, programmatic requirements or other substantial deviation from the intent of such documents.

1.1.10    The "Site" is the real property on which the Project is located.

1.1.11    The "Specifications" are that portion of the Construction Documents consisting of the written requirements for materials, equipment, construction systems, standards and workmanship.

1.1.12  "Subcontractor" means any person or entity engaged by or under the Contractor as an independent contractor to perform a portion of the Work and shall include its consultants, material suppliers, equipment lessors and manufacturers.

1.1.13  "Substantial Completion" means the date on which the Work, or an agreed upon portion of the Work, is sufficiently complete so the Owner can occupy and use the Project for the Owner's intended purposes. "Substantial Completion" may occur no earlier than the date the Owner has received all certificates of occupancy and any other permits, approvals, licenses, and other documents from any governmental authority necessary for the beneficial occupancy of the Project by the Owner and its tenants.

1.1.14  The "Work" means and construction services required by the Contract Documents, including all necessary labor, materials, equipment, machinery, supervision, inspection, permits, testing, start-up, temporary utilities and other temporary facilities to permit the Contractor to build the Project consistent with the Construction Documents.  The "Work" includes all incidental and reasonably inferable work necessary for the completion of the Project even though not specifically described in the Contract Documents.

1.1.15  "Knowledge," "recognize," and "discover," and their respective derivatives, when used in reference to the Contractor, shall be interpreted to mean that which the Contractor knows (or should know), recognizes (or should recognize), and discovers (or should discover) in exercising reasonable care and skill.

1.2  Interpretation.

1.2.1  Intent.  The Contract Documents are intended to permit the Contractor to complete the Work and all obligations required by the Contract Documents within the Contract Time and the Contract Sum.  The Contract Documents are intended to be complementary and shall be interpreted in harmony so as to avoid conflict, with words and phrases interpreted consistent with construction industry standards.

1.2.2  Inconsistencies or Conflicts.  In the event of a conflict or discrepancy in the Contract Documents, this Agreement shall take precedence over the other Contract Documents, figure dimensions shall take precedence over scale measurements, large scale details shall take precedence over small scale drawings, and drawings of a later date shall take precedence over those of an earlier date.

1.2.3  Contractor Investigation.  The Contractor represents that it has investigated and evaluated the nature and locality of the Site and the conditions and difficulties under which the Work is to be performed, and has correlated its investigation with the requirements of the Construction Documents.  The Contractor represents that it has entered into this Agreement on the basis of its own investigation and evaluation and not in reliance upon any opinions or representations of the Owner.  The Contractor has examined the Contract Documents and has executed this Agreement with full knowledge and understanding of the Contract Documents.

1.2.4  Lower-Tier Participants.  The Contractor shall be responsible to the Owner for the acts and omissions of its Subcontractors and their employees, consultants, subcontractors, suppliers and agents.  The Contractor warrants that it and its Subcontractors are licensed as required by the laws of the state in which the Project is located.

1.2.5  Third-Party Rights.  Nothing contained in the Contract Documents shall create a contractual relationship between the Owner and any Subcontractor or other third party, but the Owner shall be an intended third-party beneficiary of all subcontracts, purchase orders, and other agreements between the Contractor and third parties.

1.2.6  Entire Agreement.  The Contract Documents form the entire agreement between the Owner and the Contractor and, by incorporation in this Agreement, are as fully binding as if repeated in this Agreement. This Agreement supersedes all prior negotiations, representations and agreements.

1.2.7  Applicable Law.  This Agreement shall be governed by the laws of the state in which the Project is located.  State-specific changes to this Agreement and the other Contract Documents are set forth in

Attachment 1 to this Agreement. The state-specific changes modify, add to and delete from the language of this Agreement and the other Contract Documents. Where any language of this Agreement or the other Contract Documents conflicts or is inconsistent with the state-specific changes, the state-specific changes shall control. If any provision of the Contract Documents is determined to be illegal or otherwise unenforceable, such determination shall not affect the validity or enforceability of the remaining provisions.

1.3    Representatives.

1.3.1    The Owner's Representatives. The Owner designates **John Woods** as the "Owner's Project Manager." The Owner's Project Manager has authority for the day-to-day administration of this Agreement on behalf of the Owner. Whenever approval is required for Changes, per Article 7 below, Contractor is required to obtain the Owner's Project Manager's approval along with the following additional approvals:  Jeff Jones, Senior Vice President, Construction, Simon Property Group for changes up to $100,000, Michael E. McCarty, Executive Vice President, Development Operations, Simon Property Group for changes greater than $100,000.

1.3.2    The Contractor's Representative. The Contractor designates **Will Elia** as the "Project Manager." The Project Manager has authority for the day-to-day administration of the Project on behalf of the Contractor. The Contractor also designates **Phil Borst** as the "Contractor's Representative." The Contractor's Representative has the authority to bind the Contractor. Whenever approval of the Contractor is required, the approval shall be binding upon the Contractor only if it is in writing and signed by the Project Manager or the Contractor's Representative.

1.3.3    The Project Team. The Contractor's Project Manager, Superintendent, and any approved Subcontractors for the Project are identified in the attached Exhibit B. These persons and entities are collectively referred to as the "Contractor's Project Team."

1.3.4    Changes. Either party may designate additional persons to act as a Representative, and the Owner may change its Representative, by notifying the other party in writing of such changed or additional Representative(s). The Contractor's Representative and Project Team may be replaced only with the Owner's written approval.

1.4    Assignment. The Contractor shall not assign this Agreement or the Contractor's obligations under this Agreement. The Owner shall have the right to assign this Agreement to any successor to its interest in the Project as long as the successor in interest assumes all of the duties and liabilities of the Owner under this Agreement. Upon any such assignment, the Owner shall be relieved and released from any further liability under this Agreement. If this Agreement is assigned by the Owner prior to final payment, however, the Owner will be relieved and released from further liability under this Agreement only if the assignee is reasonably capable of meeting its continuing financial commitments under this Agreement.

1.5    No Waiver. The failure of either party to insist upon the performance of any of the obligations under the Contract Documents shall not be construed as a waiver of such obligation.

1.6    Notice. Notice to the other party will be deemed to have been given if delivered to the other party's Representative by personal delivery or by certified mail, return receipt requested, or by confirmed facsimile or electronic transmission.

1.7    Confidentiality. The Contractor acknowledges that certain of the Owner's valuable, confidential, and proprietary information may come into the Contractor's possession. Accordingly, the Contractor agrees to hold all information it obtains from or about the Owner in strictest confidence, not to use such information other than for the performance of the Contractor's services, and to cause its Subcontractors to whom such information is transmitted to be bound to the same obligation of confidentiality to which the Contractor is bound.    In the event of any violation of this provision, the Owner shall be entitled to preliminary and permanent injunctive relief as well as an equitable accounting of all profits or benefits arising out of such violation, which remedy shall be in addition to any other rights or remedies to which the Owner may be entitled. The Contractor shall not use and shall keep its employees, agents, and consultants from using the name, trademark and logo of the Owner or any subsidiaries or affiliates thereof in any sales or marketing publications or advertisements, without

the prior written consent of the Owner.  The Contractor shall not divulge information concerning the Project to anyone without the Owner's prior written consent.  The Contractor shall obtain a similar agreement from its Subcontractors.  This requirement shall survive the expiration or termination of this Agreement.

1.8    Business Ethics Standards.  The Contractor shall maintain business ethics standards to avoid any impropriety or conflict of interest which could be construed to have an adverse impact on the Owner.  The Contractor shall take reasonable actions to prevent any actions or conditions which could result in a conflict with the Owner's interests.  These obligations shall apply to the activities of the Contractor and its employees, agents, and Subcontractors.  The Contractor shall not make or cause to be made any cash payments, commissions, employment, loans, free work, substantially discounted work, or any other consideration to the Owner's representatives, agents or employees or their relatives.  As it relates to gifts, entertainment or free travel, Owner's representatives, agents or employees or their relatives may only accept same which is reasonable in context of the Project and facilitates Owner's interests.  Moreover, Contractor is forbidden to offer and Owner's representatives, agents or employees or their relatives are forbidden to accept any gifts, entertainment or free travel which may reasonably be deemed to affect Owner's representatives, agents or employees or their relatives' judgment or which is accompanied by an understanding, either express or implied, that the recipient is in any way obligated to do something in exchange for the gifts.  The Contractor and its representatives, agents or employees or their relatives shall not receive any cash payments, commissions, employment, gifts, entertainment, free travel, loans, free work, or substantially discounted work or any other consideration from representatives of Subcontractors or material suppliers or any other individuals, organizations, or businesses receiving funds in connection with the Project that would reasonably be deemed to affect Contractor's or its representatives', agents' or employees' judgment or is accompanied by an understanding, either express or implied, that the Contractor or its representatives, agents or employees are in any way obligated to do something in exchange for the gifts.  The Contractor agrees to notify the Owner's representatives within forty-eight (48) hours of any instance where the Contractor becomes aware of a failure to comply with the provisions of this paragraph.  The telephone number to report any concerns related to any possible violations of the Business Ethics Standards is 866-363-3728.

1.9    The Lender.  The Owner may finance the Work and, if the Work is financed, must comply with certain terms and conditions embodied in the lenders' construction loan agreements.  The Contractor agrees to comply with the reasonable requirements of the lenders.  The Owner may assign this Agreement to the lenders.    The Contractor shall execute all consents reasonably required to facilitate such assignment.

1.10    Diversity.  The Contractor expressly acknowledges that it is a condition of this Agreement that it make good faith best efforts, and agrees to require its Subcontractors to make good faith best efforts, to utilize minority business enterprises (MBEs), woman business enterprises (WBEs) and disadvantaged business enterprises (DBEs) for the Project, including such efforts to award or cause to be awarded subcontracts and purchase orders therefor.  The Contractor shall provide a list of all of its MBE, WBE and DBE Subcontractors detailing the scope of work and the dollar amount of each.  The Contractor agrees that the Owner shall have access to the personnel of the Contractor (and its Subcontractors) and documents in order to monitor, review and ensure compliance with this paragraph.

1.11    Counterparts.  This Agreement may be executed in any number of counterparts, each of which when executed and delivered shall be an original, but all such counterparts shall constitute one and the same agreement.  Signatures of this Agreement may be transmitted via electronic means (including facsimile or e-mailed PDF scan) and shall be considered an original and binding against the party that executed and delivered such signature via electronic means.

## ARTICLE 2
## INTENTIONALLY DELETED

**ARTICLE 3**
**CONSTRUCTION**

3.1    <u>Construction Documents.</u>

3.1.1    <u>Revisions to the Construction Documents</u>.  The Owner and the Contractor acknowledge that, as of the date of this Agreement, not all of the Construction Documents may be finalized.  The Construction Documents that have been furnished to the Contractor as of the date of this Agreement are identified in the attached Exhibit A.  Revisions to the Construction Documents made subsequent to the date of this Agreement shall be consistent with the design intent expressed in the Construction Documents identified in the attached Exhibit A.  The Contractor shall immediately report in writing to the Owner the nature and magnitude of any deviations between the Construction Documents identified in the attached Exhibit A and any Construction Documents provided to the Contractor subsequent to the date of this Agreement.  If the Contractor complies with the requirements of Article 7, the Contractor shall be entitled to an increase in the Contract Sum for the increased cost of the work caused by such deviations, but only if such deviations constitute a Scope Change.  Otherwise, the Contractor shall not be entitled to an increase in the Contract Sum.

3.1.2    <u>Value Engineering.</u>  The Contractor shall consult with the Owner and the design professionals of record regarding alternative approaches to design and construction.  The Contractor shall make appropriate recommendations to the Owner with respect to the selection of building systems, equipment, and materials, construction feasibility, time requirements for procurement, installation and completion of the proposed construction, and estimates of construction cost for alternative designs.

3.1.3    <u>Tests.</u>  The Contractor shall, within such time as to not delay the Project, advise the Owner of the need or advisability of securing tests, analyses, studies, reports or consultants' services in connection with the evaluation of the Construction Documents.  Otherwise, the tests, analyses, studies, reports and consultant's services provided by or for the Contractor or the Owner shall be considered sufficient for the Contractor to perform within the Contract Sum (as defined in Article 5) and the Contract Time.  Tests, analyses, studies, reports and consultant's services provided by the Owner shall not relieve the Contractor of the responsibility to perform in accordance with this Agreement.

3.1.4    <u>Fast Track.</u>  If requested by the Contractor to assure the timely delivery of equipment, materials or building systems, and approved by the Owner, or if directed by the Owner, the Construction Documents shall be prepared on a "fast-tracked" or phased construction basis and the Contractor shall proceed with the Work based on designated Construction Documents packages before the completion of the remaining Construction Documents.  If early procurement of long-lead time items is necessary to maintain the Project Schedule, the Contractor shall advise the Owner of the need for early procurement.

3.1.5    <u>Third-Party Approvals</u>.  The Contractor shall meet with governmental authorities having jurisdiction over the Project to clarify and confirm applicable Legal Requirements and to seek preliminary and final approvals from such authorities. The Owner shall be provided with reasonable notice of such meetings and afforded the opportunity to attend the meetings. The Contractor shall periodically update its review of applicable Legal Requirements, incorporate changes in the Plans and Specifications necessitated by Legal Requirements, and advise the Owner if any portion of the Plans and Specifications may cause a violation of Legal Requirements. The Contractor shall assist the Owner in filing the required documents for the approval of the lenders and governmental authorities having jurisdiction over the Project and shall be responsible for revising the Construction Documents as necessary to obtain all approvals, permits, and certificates from those authorities.  The Contractor shall pay royalty and license fees for patented designs, processes and products.  The Contractor shall defend suits or claims for infringement of patent rights and shall indemnify the Owner for all related damages, costs and expenses, including attorney's fees, unless the particular design, process or product of a particular manufacturer is required by the Owner.  If the Contractor reasonably believes that the use of a required design, process or product may infringe a patent, the Contractor shall promptly inform the Owner of the possible infringement.

3.1.6    <u>FM Global Approval</u>.  The Owner is insured by a master property loss insurance program requiring Owner to meet FM Global engineering guidelines.  All construction criteria, guidelines, tests, and

alternative designs applicable to the Project shall meet the FM Global engineering guidelines in effect as of the date of this Agreement. The Global Risk Checklist attached to this Agreement as Exhibit D-3 identifies or highlights those FM Global criteria, guidelines, and tests that usually apply to the Owner's buildings and which shall be incorporated in the appropriate subcontracts. The Contractor shall verify, at the time of Submittals, the most current criteria, guidelines and tests by referring to www.fmglobaldatasheets.com. Submissions for FM Global Approval shall be made to Edward Nickerson, PE, Global Risk Consultants Corp, 111 W. Washington Street, Suite 1815, Chicago, IL 60602,   (630) 551-4570.

3.1.7  Legal Requirements.  The Contractor shall review applicable Legal Requirements, correlate the Legal Requirements with the Construction Documents, and advise the Owner if any portion of the Construction Documents may cause a violation of the Legal Requirements.  If the Contractor, in the exercise of reasonable care and skill, believes or is advised by a Design Professional that the implementation of any request of the Owner would cause a violation of Legal Requirements, the Contractor shall notify the Owner in writing.

3.2    The Owner's Information.  The Owner shall provide the following:

.1    a survey describing the Site and related boundaries, topography and reference points for use during construction, including existing service and utility lines.

.2    a legal description of the Site.

.3    geotechnical reports describing subsurface conditions at the Site.

.4    environmental studies, reports and impact statements describing the environmental conditions of the Site, including Hazardous Conditions, if in the Owner's possession.

.5    temporary and permanent easements, zoning, historic preservation and other requirements and encumbrances affecting the use of the Site.

.6    record drawings of existing structures at the Site, if in the Owner's possession.

.7    tests, analyses, studies, reports and consultant's services that are specifically stated to be the Owner's responsibility elsewhere in the Contract Documents.

The Owner shall furnish information or services, and shall render decisions and give approvals, to the extent required by the Contract Documents and requested by the Contractor.

3.3    General Duties.

3.3.1  Workmanlike Performance.  Unless otherwise provided in the Contract Documents, the Contractor shall provide and pay for all labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, permits, telephone, transportation, and other facilities and services necessary for the proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated in the Work.  The Contractor shall perform the Work efficiently and in a workmanlike manner and with the requisite expertise, skill, competence and resources.  The Contractor shall have control over the means, methods, sequences and techniques of construction.

3.3.2  Coordination.  The Contractor shall coordinate, supervise and direct the Work.  The Contractor shall, consistent with the Project Schedule, cooperate with the Owner in scheduling and performing the Work to avoid conflict, delay or interference with the Owner's own forces and separate contractors.

3.3.3  Control of the Site.  The Contractor shall be responsible for its employees, laborers, Subcontractors and others performing portions of the Work.  The Contractor shall remove from the Site any person or entity under the Contractor's control that the Owner considers unsatisfactory.

3.3.3.1 Labor Disputes. The Contractor shall use its best efforts and judgment to adopt and implement policies and practices to avoid work stoppages, slowdowns, disputes, and strikes and shall at all times maintain Project-wide labor harmony. Except as specifically provided in this Agreement, the Contractor shall not be entitled to an increase in the Contract Time as a result of work stoppages, slowdowns, disputes, or strikes.

3.3.3.2 Security. The Contractor shall be responsible for the security of the Project and the Site. Only authorized personnel shall be permitted on the Site. Site-parked mobile equipment and operable machinery and hazardous portions of the Project shall be kept locked or otherwise made secure.

3.4    Subcontractors. The Contractor shall contract with Subcontractors who are duly licensed as required by the laws of the state in which the Project is located and who have the requisite experience, skill, competence and resources.

3.4.1    Owner Approval. The Contractor shall prepare and submit to the Owner for its approval a list of the persons or entities proposed to bid upon each of the principal portions of the Work and their experience and qualifications. The Contractor shall not contract with, or accept bids from, any person or entity to whom the Owner has a reasonable objection. If the Owner has a reasonable objection to awarding a Subcontract to a Subcontractor recommended by the Contractor after a bid is received, the Contractor shall propose another to whom the Owner has no reasonable objection. If a proposed but Owner-rejected Subcontractor was reasonably capable of performing the Work, the Contract Sum shall be increased by Change Order by the net effect of Owner- approved Subcontractors (taking into account Subcontractors whose bids exceed those of bidders recommended by the Contractor and those whose bids are less than bidders recommended by the Contractor) whose bids in the aggregate exceed those of the bidders recommended by the Contractor. The Contract Sum shall be increased by the lesser of (i) the amount by which the bids of the Owner-approved Subcontractors exceed the bids of the bidders recommended by the Contractor or (ii) the amount by which the Owner-approved Subcontractors exceed the amount utilized by the Contractor in calculating the Contract Sum. The Contract Sum shall not be increased on account of the Owner's approval or designation of Subcontractors. The Contractor shall not change a Subcontractor previously selected without the Owner's written approval.

3.4.2    Flow-down. The Contractor agrees to bind each Subcontractor to the terms of this Agreement and the Contract Documents so far as applicable to the Subcontractor's work. If this Agreement is terminated pursuant to Article 11, the Contractor shall, upon the written request of the Owner, assign to the Owner, or a third party designated by the Owner, any subcontracts designated by the Owner, but no such assignment shall release or discharge the Contractor or its surety from liability under this Agreement for acts, omissions and events occurring prior to the assignment.

3.5    Meetings and Reports. Progress meetings shall be held weekly unless otherwise agreed. The Contractor's attendance is mandatory. The Contractor shall submit to the Owner a Monthly Status Report in such form as the Owner shall request. Each Monthly Status Report shall describe the current status of the Work, including the following:

.1    The actual progress during the month in comparison to the Project Schedule and Milestone Dates (if any) and, if actual progress is behind schedule, plans the Contractor will employ to recover the Project Schedule;

.2    significant progress on major items of Work during the past month;

.3    progress photographs to document the current status of the Work;

.4    any significant problems encountered during the month and the plan for resolution of such problems;

.5    the status of Change Orders and proposed Change Orders, including a review of any changes that may impact the critical path of the Project Schedule;

.6    any claims anticipated by the Contractor with respect to the Work; and

.7    an updated material purchase log.

3.6    <u>Permits, Fees and Notices.</u>  Unless otherwise provided in the Contract Documents, the Contractor shall secure and pay for all necessary permits and governmental fees, licenses and inspections necessary for the Work. The Contractor shall coordinate any and all inspections required by governmental authorities having jurisdiction over the Project.  The Contractor shall give all notices and comply with all applicable Legal Requirements. The Contractor shall comply with, and assume financial responsibility for, all applicable federal, state and local tax laws, social security acts, unemployment compensation acts and workers' compensation acts relating to the Contractor's performance of the Work.

3.7    <u>Submittals.</u>  The Contractor shall timely prepare or receive from its Subcontractors, and review, approve and submit to the design professional of record and, if requested, the Owner, all shop drawings, product data and samples required by the Contract Documents ("Submittals").

3.7.1 <u>Submittal Schedule.</u>  The Contractor shall prepare a Submittal Schedule promptly after the execution of this Agreement and thereafter as necessary to maintain a current Submittal Schedule, and shall submit the Submittal Schedule(s) to the Owner for approval. Each Submittal Schedule shall (1) specify those Submittals the Owner has requested to review (all other Submittals shall be forwarded direct to the Architect), (2) be coordinated with the Project Schedule, and (3) allow the Owner reasonable time to review Submittals. If the Contractor fails to timely submit a required Submittal Schedule, the Contractor shall not be entitled to any increase in Contract Sum or extension of the Contract Time based on the time required for review of Submittals.

3.7.2 <u>Approvals.</u>  By approving Submittals, the Contractor represents that it has verified all related materials, field measurements and field construction criteria for conformity with the requirements of the Contract Documents. The Contractor shall not be relieved of responsibility for defective or non-conforming Work by the approval of Submittals. If approval of Submittals is required in order to meet FM Global requirements, the Contractor shall submit them as necessary in order to receive FM Global approval.

3.8    <u>Equipment and Materials.</u>  The Contractor shall inspect all equipment and materials delivered to the Site and shall reject any equipment or materials that will not conform with the Contract Documents and applicable Legal Requirements when properly installed.   When required by the Contract Documents or by the Owner, the Contractor shall obtain the Owner's approval of the materials and equipment the Contractor contemplates incorporating into the Work.  The Contractor shall provide full information concerning the materials, including samples.

3.9    <u>Site Access.</u>  The Contractor is responsible for its Site access. The Contractor shall keep roads, walks, ramps, and other areas on and adjacent to the Site in good working condition and free from obstructions that might present a hazard to or interfere with traffic or the public.  The Contractor shall provide adequate barricades, signs and other devices for traffic guides and public safety.  When construction operations necessitate the closing of traffic lanes, the Contractor shall be responsible for arranging such closing in advance with the appropriate governmental authorities.  The Contractor shall confine operations at the Site to areas permitted by Legal Requirements and the Contract Documents.

3.10   <u>Cutting and Patching.</u>  All cutting of structural members shall be performed by the Subcontractor responsible for the involved structural work, subject to the review and approval of the structural engineer for the Project.

3.11   <u>Clean-Up.</u>  The Contractor shall at all times keep the Project and the Site free from the accumulation of waste materials.  Upon completion of the Work, the Contractor shall remove all waste materials and the Contractor's tools, equipment, machinery and surplus materials.  If the Contractor fails to clean up, the Owner may do so and the cost shall be charged to the Contractor.

3.12    Temporary Facilities.  The Contractor shall provide, maintain, and remove all temporary offices, structures, sheds and storage facilities and all related utilities and telephone service.  Storage areas for the use of Subcontractors shall be subject to the Owner's approval.

3.13    Uncovering of Work.  If any portion of the Work is covered contrary to the request of the design professional of record, governmental authorities or the Owner, or contrary to the requirements of the Contract Documents, it shall be uncovered for observation and replaced at the Contractor's expense.  Otherwise, if the Owner directs the Work to be uncovered by the Contractor and the uncovered Work is in accordance with the Contract Documents, the cost of uncovering and replacement shall be reimbursed to the Contractor.  If the Work is not in accordance with the Contract Documents, the cost shall be borne by the Contractor.

3.14    Correction of Work.  The Contractor shall correct all damaged, defective and non-conforming Work at its expense and without reimbursement by the Owner.  The Contractor shall, within seven (7) days of receipt of written notice from the Owner, take meaningful steps to commence the correction of damaged, defective or non-conforming Work, including the correction, removal or replacement of the Work and any related damage to adjacent materials, structures and other parts of the Work.  If the Contractor fails to do so, the Owner may make good the deficiencies and the cost shall be charged to the Contractor.  If damaged, defective or non-conforming Work creates an emergency requiring an immediate response, the seven (7) day corrective period shall be deemed inapplicable.

3.15    Warranty.  The Contractor warrants to the Owner that materials and equipment furnished by the Contractor shall be of good quality and new unless otherwise required or permitted by the Contract Documents and the Work will be free from defects and will conform to the requirements of the Contract Documents.  Substitutions not approved by the Owner shall be considered non-conforming Work.

3.15.1  Call-Back Warranty.  The Contractor shall correct and cure, at the Contractor's expense, all defective, non-conforming or inoperable Work which appears within one (1) year from Substantial Completion. With respect to any Work completed or corrected after Substantial Completion, the Contractor's warranty shall commence when such Work is satisfactorily completed or corrected by the Contractor.  Approximately ten (10) months from the Date of Substantial Completion, the Contractor shall contact the Owner and arrange for a walk-through of the Project to observe the completed construction. Based on the walk-through, the Contractor shall prepare a list of items of Work requiring repair or replacement pursuant to this warranty. The Owner may supplement the list. The Contractor shall repair and replace the items on the list prior to the expiration of the one (1) year warranty. If the Contractor fails to contact the Owner to arrange for the walk-through, fails to conduct the walk-through or prepare the list, or fails to complete the list prior to the expiration of the one (1) year warranty, the one (1) year warranty shall be extended until this procedure is followed and completed by the Contractor.  This one (1) year period applies only to the Contractor's obligation to correct defective, non-conforming and inoperable Work and is not intended as a period of limitations for or waiver of any other rights or remedies the Owner may have against the Contractor under applicable law or the Contract Documents.  Nor shall the one (1) year warranty affect, limit or impair the Contractor's responsibility for latent defects in the Work that do not appear within the applicable warranty period.  Neither the acceptance of the Work nor any payment shall constitute a waiver of any claims against the Contractor for defective or nonconforming Work, whether latent or apparent, or otherwise act to release or discharge the Contractor from liability.

3.15.2  Special Warranties.  The foregoing warranty is in addition to all special and extended warranties required by the Contract Documents or otherwise received from Subcontractors, suppliers and manufacturers. All such special and extended warranties shall also be deemed made by the Contractor to the Owner but shall not reduce or limit the liability of any Subcontractor, supplier or manufacturer.

3.15.3  Breach of Warranty.  The Contractor shall indemnify and defend the Owner against, and compensate the Owner for, all damages, costs, and expenses, including attorney's fees, incurred by the Owner as a result of the Contractor's failure to abide by its obligations under this paragraph 3.15.

3.15.4  Assignment of Warranties.  As a condition precedent to final payment, the Contractor shall furnish to the Owner, in form acceptable to the Owner, all warranties and operating manuals.  The Contractor shall assign to the Owner at the time of final completion of the Work all suppliers' and manufacturers'

warranties relating to materials and labor used in the Work and shall perform the Work in such manner so as to preserve all such warranties.

3.16    Record Drawings. Upon Substantial Completion, the Contractor shall deliver to the Owner the CAD disc of the Construction Documents or other Owner-approved equivalent drawings capable of reproduction by direct printing process, including revisions made during construction, each conspicuously noted as a "record drawing." The record drawings shall be based on marked-up prints maintained by the Contractor and its Subcontractors, supplemental and clarification documents issued during construction, and Change Orders.

3.17    Close-Out Documents. As a condition precedent to final completion, the Contractor shall deliver to the Owner all Project close-out documents, including (a) punch lists, marked to confirm completed items, (b) all lien waivers and releases, (c) O & M manuals, (d) warranties and certifications required by the Contract Documents, (e) a CAD disk containing the approved record drawings as required by paragraph 3.16 of this Agreement, (f) photographs of all stages of construction to accurately document the progress of the Project, (g) all renderings, color boards, and models relating to the Project.

3.18    Indemnification. To the fullest extent permitted by law, the Contractor shall defend and indemnify the Owner and the Owner's lender, their employees and agents, from and against all claims, damages, costs and expenses, including attorney's fees, arising out of or resulting from the performance of the Work, but only to the extent caused by the acts or omissions of the Contractor, its laborers, employees, agents, Subcontractors, and anyone for whose acts they may be liable. This indemnification obligation shall not be limited by the amount or type of damages, compensation or benefits payable under workers' compensation acts, disability benefit acts or other employee benefit acts.

3.19    Separate Contractors. The Owner reserves the right to perform construction or operations related to the Project with the Owner's own forces, and to award separate contracts in connection with other portions of the Project or other construction or operations on the Site. The Contractor shall provide for coordination of the activities of the Owner's own forces and of each separate contractor with the Work of the Contractor.

3.19.1 The Contractor shall afford the Owner and separate contractors reasonable opportunity for introduction and storage of their materials and equipment and performance of their activities, and shall connect and coordinate the Contractor's construction and operations with theirs as required by the Contract Documents.

3.19.2 If part of the Contractor's Work depends for proper execution or results upon construction or operations by the Owner or a separate contractor, the Contractor shall, prior to proceeding with that portion of the Work, promptly report to the Owner apparent discrepancies or defects in such other construction that would render it unsuitable for such proper execution and results. Failure of the Contractor so to report shall constitute an acknowledgement that the Owner or separate contractor's completed or partially completed construction is fit and proper to receive the Contractor's Work, except as to defects not then reasonably discoverable.

3.19.3 The Owner shall be reimbursed by the Contractor for costs incurred by the Owner which are payable to a separate contractor because of delays, improperly timed activities or defective construction of the Contractor. The Contractor shall promptly remedy damage wrongfully caused by the Contractor to completed or partially completed construction or to property of the Owner or separate contractors.

## ARTICLE 4
## THE CONTRACT TIME

4.1    The Project Schedule. Time is of the essence of this Agreement. The Work shall commence no later than **May 3, 2021**, consistent with the Project Schedule, Exhibit C to this Agreement. Substantial Completion shall be achieved no later than **November 4, 2021**, (the "Contract Time"), subject to extensions of the Contract Time as set forth in this Agreement. The timing of all Work and material and equipment deliveries shall conform to the Project Schedule. The Owner shall have the right to direct the Contractor to modify the Project Schedule to vary the sequence, suspend or delay the commencement or progress of the Work.

4.1.1   Revised Schedules. The Project Schedule shall be revised as required by Site conditions and the actual progress of the Work, but such revisions shall not relieve the Contractor of its obligation to complete the Work within the Contract Time and by the Milestone Dates.

4.2   Delay Caused by Contractor.   If the Work is delayed, disrupted or interfered with by any act or omission of the Contractor, or its Subcontractors, or others for whom they are responsible, or by acts, omissions, events or occurrences for which the Contractor is not expressly entitled to an increase in the Contract Time under this Agreement, the Contractor shall compensate the Owner as set forth in paragraph 4.2.1, below.

4.2.1   Liquidated Damages. The Contractor understands that if Substantial Completion is not achieved by the date set forth in this Agreement, the Owner will suffer damages that are difficult and expensive to determine and accurately quantify and document. The Contractor agrees that if Substantial Completion is not achieved by the date set forth in this Agreement, the Contractor shall pay the Owner, as liquidated damages and not as a penalty, the sum of $ 1,147.00 for each day that the actual date of Substantial Completion exceeds the date set forth in this Agreement.

4.2.2   Acceleration. If the Contractor should (1) fail, refuse or neglect to supply a sufficient number of workers or deliver materials or equipment with such promptness as to prevent delay in the progress of the Work; (2) fail to commence and diligently prosecute the Work and proceed to the point where the Contractor should have proceeded in accordance with the Project Schedule; or (3) fail to commence, prosecute, finish, deliver or install the different portions of the Work in accordance with the Project Schedule, the Owner shall have the right to direct the Contractor to prepare a written plan, for the Owner's approval, to accelerate the Work to comply with the Project Schedule, including, without limitation, providing additional labor, expediting deliveries of materials and equipment, performing overtime and/or resequencing the Work, without adjustment to the Contract Sum. Upon the Owner's approval of the acceleration plan, the Contractor shall accelerate the Work in accordance with the plan.

4.3   Delay to Contractor's Work. The Contractor may be entitled to an increase in the Contract Time to the extent the Contractor can demonstrate an impact to the Critical Path as a result of the Contractor's Work being delayed, interfered with, or otherwise disrupted by the Owner, a separate contractor, a suspension of the Work by the Owner, a differing site condition as provided in paragraph 7.7, or by Change Orders, Hazardous Conditions that are not the Contractor's responsibility, fire, war, flood, earthquake, abnormal weather conditions or other acts of God, or industry-wide labor disputes or delays in transportation.

4.3.1   Claims. A claim for an increase in the Contract Time shall be made by the Contractor in writing to the Owner no later than ten (10) days after the commencement of the act, omission, event or occurrence giving rise to the claim or the claim shall be waived. The Contractor shall provide the Owner with an estimate of the probable impact of the act, omission, event or occurrence and evidence necessary to demonstrate the impact on the critical path activities of the Project Schedule. If the Contractor is entitled to an increase in the Contract Time, the Contract Time shall be extended by Change Order by the number of critical path days delayed. The increase in the Contract Time shall be net of any delays that are the responsibility of the Contractor and shall also be net of any contingency or "float" included in the Project Schedule. The Owner may direct the Contractor to accelerate the Work to minimize or eliminate the impact of a delay. If the delay is excusable to the Contractor under this Agreement, the acceleration shall be at the Owner's expense pursuant to Article 7.

4.3.2   Abnormal Weather. If weather conditions are the basis for a claim for an increase in the Contract Time, the claim shall be documented by data substantiating that weather conditions were abnormal for the period of time, could not have been reasonably anticipated, and had an adverse effect on the critical path of the Project Schedule. Weather conditions relating to precipitation (rain, sleet, hail and snow) or temperature shall be considered "abnormal" only if the precipitation or temperature in the period the weather delay is claimed exceeds the average for that period, based upon the preceding twenty years, by more than thirty percent (30%), but the Contract Time shall be increased only by the number of days by which the weather delay exceeds such period.

4.3.3  Delay Damages.  The Contractor may be entitled to an increase in the Contract Sum, but only for and to the extent of an increase in the Contractor's General Conditions and General Requirements caused by a delay to the critical path of the Project Schedule and caused by the Owner, a separate contractor, a suspension of the Work by the Owner, or a differing site condition under paragraph 7.7, but only if the Contractor timely submits a written claim to the Owner pursuant to paragraph 4.3.1.  Otherwise, the Contractor's sole remedy for any other delay in the commencement, prosecution, or completion of the Work, disruption to or interference with the performance of the Work, loss of productivity, or other similar claims, whether or not foreseeable, shall be an increase in the Contract Time unless caused by acts constituting intentional interference by the Owner with the Contractor's performance of the Work where such acts continue after the Contractor's written notice to the Owner of such interference.  The Owner's exercise of its rights to make changes in the Work, to suspend the Work or to require the correction of damaged, defective or non-conforming Work shall not under any circumstances be construed as intentional interference by the Owner.  In no event shall the Contractor be entitled to any compensation or the recovery of any damages in connection with any such claims, including consequential or incidental damages, lost opportunity costs, impact damages, or other similar remuneration.  If the Contractor submits a progress report indicating, or the Contractor otherwise expresses an intention to achieve, completion of the Work prior to any completion date required by this Agreement or expiration of the Contract Time, no liability of the Owner to the Contractor for any failure of the Contractor to so complete the Work shall be created, implied or permitted.

4.4    Work Suspension.  The Owner may suspend the Work upon two (2) days written notice to the Contractor.  The Contractor shall resume the Work as directed by the Owner. If the Project is resumed after being suspended for more than sixty (60) days, the Contract Sum may be equitably adjusted.

4.5    Substantial Completion.

4.5.1    Joint Inspection.  The Contractor shall notify the Owner when it believes that the Work is Substantially Complete.  Within ten (10) days of the Owner's receipt of the Contractor's notice, the Owner and the Contractor shall jointly inspect the Work to determine whether the Work is Substantially Complete.

4.5.2    Certificate of Substantial Completion.  When the Work is Substantially Complete, the Contractor shall prepare a Certificate of Substantial Completion for approval and signature of the Design Professional of record.  The Certificate of Substantial Completion shall set forth the date of Substantial Completion and establish responsibility for Project security, maintenance, utilities and insurance pending final payment.  The Certificate of Substantial Completion shall not act to establish the Date of Substantial Completion unless and until signed and accepted by the Owner.

4.5.3    Punch List.  Upon achieving Substantial Completion, the Contractor shall prepare for the Owner's review a comprehensive punch list of items to be completed or corrected.  The Owner may review and supplement the punch list, in which event the Contractor shall add the supplemented items to the Contractor's punch list. When the Contractor believes it has finished all punch list work that is required for final completion, the Owner will inspect the Work.  Any items noted during the inspection that are not completed will be corrected by the Contractor prior to final payment.  The failure to include an item on the punch list shall not act to waive the rights of the Owner or otherwise alter the responsibility of the Contractor to complete the Work in accordance with the Contract Documents.

4.6    Partial Occupancy.  The Owner and its lessees and separate contractors may occupy or use any completed or partially completed portion of the Work ("Partial Occupancy") whether or not the applicable portion of the Work is Substantially Complete, subject to the approval of insurers and governmental authorities having jurisdiction over the Project.  The Contractor shall make available for the Owner's use building services such as heating, ventilation, water, lighting, telephone, elevators, and security for the portions to be occupied. Immediately prior to Partial Occupancy, the Owner and the Contractor shall jointly inspect the area to be occupied or used to record the condition of the Work.  Partial Occupancy shall not constitute acceptance of any Work or commence any warranty period.

## ARTICLE 5
## THE CONTRACT SUM

5.1    Defined. In consideration of the Contractor's performance of the Work, the Owner shall pay the Contractor a lump sum of **$3,596,101.00** the ("Contract Sum").

5.2    Allowances. "Allowances" included in the Contract Sum for particular items of the Work are set forth in the attached Exhibit D-2. Allowances include the cost to the Contractor for the Work for the allowance.   To the extent the actual cost of any "allowance" item exceeds or is less than the cost stated in Exhibit D-2, the Contract Sum shall be increased or decreased by the difference.

5.3.    Basis of Contract Sum. Although the Contract Sum has been calculated on the basis of the Construction Documents, the Contractor represents that it has taken into account the level of completeness of the Construction Documents and has made appropriate judgments and inquiries of the Owner to clarify the Construction Documents as necessary to calculate and establish the Contract Sum.  The Contractor further represents that the Construction Documents and other information furnished to the Contractor as of the date of this Agreement has described the scope, construction requirements, and design intent of the Work in detail sufficient to enable the Contractor to perform the Work in accordance with the Contract Sum.

5.3.1 Accounting Records. The Contractor shall keep full and detailed accounts and exercise such controls as may be necessary for proper financial management, using accounting and control systems in accordance with generally accepted accounting principles.  The Contractor shall provide all computerized information (data) to the Owner in an electronically acceptable format, and shall cause any such data to be packed, unpacked, downloaded, uploaded, imported, exported, transferred, converted or otherwise manipulated to the extent necessary to provide such data in an acceptable electronic format.

5.3.2 Examination of Records.  The Owner and its accountants shall be permitted to review, audit and copy the Contractor's records relative to Change Orders and related parties upon reasonable notice and during normal business working hours throughout the term of this Agreement and for a period of three (3) years after final payment or longer if required by law.   "Records" shall include any and all information, materials and data of every kind and character (hard copy as well as computer readable data) that may, in the Owner's judgment, have any bearing on or pertain to this Agreement, the Project, the Contractor's compliance with the Contract Documents and the Owner's Business Ethics Standards, the pricing of Change Orders, and the accuracy of the Contractor's representations regarding pricing and claims information submitted by the Contractor. If an audit or examination in accordance with this section discloses overcharges by the Contractor in excess of $100,000.00, the cost of the Owner's audit shall be immediately reimbursed by the Contractor in addition to the overcharges and the Contractor shall pay the Owner an amount equal to ten percent (10%) of the overcharge as reimbursement for the administrative expenses of the Owner. The Contractor shall require all first-tier Subcontractors to comply with the provisions of this paragraph.

5.3.3 Related Party Transactions. If any cost of the Work is to arise from a transaction between the Contractor and a related party, the Contractor shall notify the Owner of the specific nature of the contemplated transaction, including the identity of the related party and the anticipated cost to be incurred, before any such transaction is consummated or cost incurred. The Owner may deny the Contractor's request to use the related party for the Project for any reason and in the Owner's sole discretion and regardless of whether or not the proposed transaction or use of the related party will or could impact the Contract Sum. If the Owner, after such notification, authorizes the proposed transaction, the cost of the Work incurred shall be included as a cost of the Work to be reimbursed, subject to the following terms (which terms must be included in writing in every contract between the Contractor and the related party): (1) the Owner or its representatives shall have the right to audit the books and records of the related party at any time, and (2) the Owner may direct the Contractor to cease using the related party for the Project at any time. Any contract, whether verbal or in writing, entered into between the Contractor and a related party in contravention of the requirements of this paragraph shall be at the Contractor's sole risk and cost and shall not be subject to reimbursement by the Owner (and may be deducted from payments otherwise due the Contractor). The term "related party" shall mean a parent, subsidiary, affiliate or other entity having common ownership or management with the Contractor, any entity in which any stockholder in, or management employee of, the Contractor owns any interest in excess of ten

percent in the aggregate, any person or entity which has the right to control the business or affairs of the Contractor, or any member of the immediate family.

5.3.4 <u>Truthfulness in Pricing</u>. The Contractor shall be responsible for furnishing cost and pricing data that is accurate, current and complete with respect to establishment of the Change Orders. If the Owner later determines that the cost and pricing data submitted was inaccurate, incomplete or not current, the data shall be considered "defective" and an appropriate credit shall be issued and paid to the Owner for the amount attributable to the defective data.

**ARTICLE 6**
**PAYMENTS**

6.1    <u>Schedule of Values</u>  The Owner and the Contractor have agreed upon the Schedule of Values attached to this Agreement as Exhibit D-1. The Schedule of Values shall be revised and updated with each Application for Payment to more accurately reflect the Cost of the Work.

6.2    <u>Progress Payments</u>.

6.2.1 <u>Applications for Payment.</u> Based upon Applications for Payment submitted to the Owner by the 10th day of the month, the Owner shall make progress payments to the Contractor by the 10th day of the next month. Applications for Payment received after the 10th day of the month shall not be processed until the 10th day of the next month. The period covered by each Application for Payment shall be one calendar month ending on the last day of the month. Applications for Payment shall be prepared in duplicate on the Owner's Application for Payment form, a sample of which is attached to this Agreement as Exhibit E, and shall indicate the percentage of completion of each portion of the Work as of the end of the period covered by the Application for Payment based on the Schedule of Values. Any detailed or supplemental information or documentation reasonably required by the Owner shall be supplied by the Contractor.

6.2.2 <u>Retainage.</u> The Owner shall retain from each progress payment a sum equal to ____ten percent (10%) of the progress payment authorized by the Owner for payment to the Contractor.

6.2.3 <u>Determination of Progress Payments</u>. The amount of each progress payment shall be subject to the Owner's approval and shall be computed as follows:

.1    Take the portion of the Contract Sum for completed Work based on the committed Schedule of Values;

.2    Add the portion of the Contract Sum for materials and equipment delivered and suitably stored at the Site by the Contractor for subsequent incorporation in the Project or, if approved in advance by the Owner, suitably stored off the Site at a location agreed upon in writing; and

.3    Subtract retainage and the aggregate of previous payments made to or on behalf of the Contractor.

6.2.4 <u>Lien Waivers.</u> The Contractor shall pay for all Work through the period covered by the previous payment received from the Owner and shall furnish satisfactory evidence, including (as a condition precedent to payment) releases and lien waivers from both Contractor and its Subcontractors on forms provided by the Owner, samples of which are attached to this Agreement as Exhibit E. If payment is made for materials or equipment stored off-site or delivered to the Site but not yet installed or incorporated in the Project, title shall pass to the Owner, but the Contractor shall remain liable for all such material and equipment until incorporated in the Project. The Contractor shall require its Subcontractors to execute the lien waiver form attached as Exhibit E (or some other form mutually agreed and legally applicable in the place of the Project). Further, the Contractor shall make, as a condition precedent to payment to its subcontractors and material suppliers, the proper execution and receipt by the Contractor and the Owner of the unconditional lien waiver form prior to any

subsequent pay applications. Further, with each pay application, the Contractor shall execute an affidavit in a form similar to that attached hereto as Exhibit E evidencing the actual, current value of Subcontractors.

     6.2.5 <u>Payment Representations.</u> The submission of an Application for Payment shall constitute a representation by the Contractor that (1) the Work covered by the Application for Payment has been completed in accordance with the Contract Documents, (2) the current payment shown is now due, (3) except as set forth in the Application for Payment, no additional amounts are due, (4) all amounts have been paid by the Contractor for Work for which previous payments have been received, (5) the Contractor has complied with and paid all amounts due under federal, state, and local tax laws, including social security, unemployment compensation and worker's compensation laws, and (6) the remaining balance of the Contract Sum is sufficient to complete the Work free and clear of liens and encumbrances.

6.3    <u>Payments to Subcontractors.</u> The Contractor shall promptly pay each of its laborers, employees and Subcontractors upon receipt of payment from the Owner. The Owner has the right to request written evidence from the Contractor that the Contractor has properly paid Subcontractors. If the Contractor fails to furnish such evidence within seven (7) days, the Owner shall have the right to contact the Subcontractors to ascertain whether they have been properly paid. The Owner shall have no obligation to pay or to see to the payment of money to a Subcontractor except as may otherwise be required by law. If any payment claim or lien is made or filed with or against the Owner or the Project, and the payment claim or lien was not filed as a result of the Owner's wrongful failure of payment, the Contractor shall, within twenty (20) days of the filing of the lien or submission of the claim, satisfy, discharge or bond-off the claim or lien, cause the Owner to be dismissed from any action which may be brought in connection with a claim or lien, and compensate the Owner for and indemnify the Owner against any and all losses, damages, and expenses, including attorney's fees, sustained or incurred by the Owner.

6.4    <u>Payment Withholding.</u> The Owner may withhold payment from the Contractor to the extent necessary, in the Owner's opinion, to protect the Owner against loss, potential damages, and attorney's fees because of: (1) damaged, defective or non-conforming Work or damage to the Owner or a separate contractor; (2) claims or liens filed or evidence indicating the probable filing of claims or liens or the failure of the Contractor to make payments to its laborers, employees, or Subcontractors; (3) evidence that the Work may not be completed within the Contract Time; (4) evidence that the Work may not be completed by a Milestone Date or within the Contract Time; and (5) the failure of the Contractor to comply with any other requirements of this Agreement. The Owner may, but is not obligated to, make direct or joint payments on behalf of the Contractor to its laborers, employees, or Subcontractors, and charge such payments against the Contract Sum. In the event Owner exercises its right to make a direct or joint payment to a Subcontractor as a result of a dispute between the Contractor and a Subcontractor, the Owner shall make a reasonable, good faith determination of the amounts due and payable to the Subcontractor, which determination shall be final.

6.5    <u>Final Payment.</u> Final payment, constituting the unpaid balance of the Contract Sum, including retainage, shall be made to the Contractor within thirty (30) days after:

    .1    The Work has been fully completed in accordance with the Contract Documents, including testing and start-up; and

    .2    the Contractor has furnished the following:

        .1    an affidavit that there are no unsatisfied claims, obligations or liens for labor, services, materials, equipment, taxes or other items performed, furnished or incurred for or in connection with the Work;

        .2    a general release executed by the Contractor waiving, upon receipt of final payment, all claims except claims previously submitted in writing to the Owner and remaining unsettled at the time of final payment;

        .3    consent of the Contractor's surety to final payment;

.4    all required training and materials stocks, operating manuals,                warranties, record drawings and other close-out requirements set forth in paragraphs 3.14 and 3.15 of this Agreement and as otherwise required by the Contract Documents; and

.5    certificates of insurance confirming that required coverages will remain in effect as required by the Contract Documents.

The foregoing requirements must be satisfied as a condition precedent to the Owner's obligation to tender final payment.

6.6    Interest. Payments due the Contractor shall bear no interest and the Contractor shall not be entitled to recover interest, statutory or otherwise.

### ARTICLE 7
### CHANGES

7.1    Change Orders. The Owner may make changes in the Work by issuing a Change Order to the Contractor and the Contractor shall comply with the Owner's directives as set forth in a Change Order. The Contract Sum and the Contract Time shall be changed only by Change Order. A Change Order signed by the Contractor shall conclusively establish the Contractor's agreement therewith. The amount of any Change Order, regardless of whether it increases or decreases the Contract Time, shall be conclusively presumed to include full and complete compensation to the Contractor and its Subcontractors for all costs, expenses and damages incurred or sustained by the Contractor due to such change or increase or decrease in the Contract Time. All changes in the Work shall be performed under applicable conditions of the Contract Documents.

If the Contractor intends to issue a Change Order or other contract modification to a Subcontractor, the value of which will or may exceed $25,000 for any single Change Order item or $150,000 in the aggregate, the Contractor shall notify the Owner in writing of the Contractor's intention and shall, as a condition precedent to the Contractor's right to issue such Change Order or other contract modification, obtain the Owner's written approval to issue the Change Order or other contract modification to the Subcontractor. The Owner may withhold its approval for any reason and in the Owner's sole discretion and regardless of whether or not the Change Order or other contract modification will or could be included in a Change Order the Contractor may submit to the Owner or otherwise impact the Contract Sum. Any Change Order or other contract modification issued by the Contractor to a Subcontractor in contravention of the requirements of this paragraph shall be at the Contractor's sole risk and cost and shall not be subject to reimbursement by the Owner.

7.2    Change Order Proposals. The Contractor shall submit a properly itemized Change Order Proposal covering additional or deleted Work. The proposal shall be itemized for the various components of the Work and segregated by labor, material, and equipment in a detailed format satisfactory to the Owner. Details to be submitted will include detailed line item estimates showing detailed materials quantity take-offs, material prices by item and related labor hour pricing information and extensions (by line item). The Contractor's proposal for a Change Order shall be submitted within seven (7) days of the Owner's request, unless the Owner extends such period of time due to the circumstances involved. The Contractor's failure to so advise the Owner within the specified time period shall constitute a waiver of the Contractor's right to an increase in the Contract Time or the Contract Sum.

7.3    Pricing.

In no event shall the mark-up for profit and overhead charged by Subcontractors exceed____**Ten** percent (**10%**).

The application of the markup percentages apply to both additive and deductive Change Orders. A deductive Change Order will be computed in the same manner as an additive Change Order. In those instances where a change involves both additive and deductive Work, the additions and deductions will be netted and the markup percentage adjustments will be applied to the net amount. If a Change Order is performed on a "time and

material" basis, the Contractor shall submit to the Owner timesheets and signed work orders at the end of each day to substantiate charges for that day.   Otherwise, the Owner shall not be required to pay for the "time and material" work. In no event will any lump sum or percentage amounts for "contingency" be allowed to be added as a separate line item in Change Orders.

7.4     Unit Price Change Order Proposals. As an alternative to lump sum Change Order Proposals, the Owner may choose the option to use Unit Prices. Agreed upon Unit Prices shall be the same for added quantities and deductive quantities. The Contractor will submit, within seven (7) days after receipt of the Owner's written request for a Unit Price Proposal, a written Unit Price proposal itemizing the quantities of each item of Work for which there is an applicable Unit Price. The quantities must be itemized in relation to each specific contract drawing. Unit Prices will be applied to net differences of quantities of the same item. Unit Prices will be considered to cover all direct and indirect costs of furnishing and installing the item including the Contractor's markup percentage.

7.5     Cost Plus Change Order Proposals. As an alternative to either lump sum Change Order Proposals or Unit Price Change Order Proposals, the Owner may elect to have changed Work performed on a cost plus basis. Upon written notice to proceed, the Contractor shall perform such authorized changed work at actual cost of the Work. The Owner and the Contractor may agree in advance in writing on a maximum price for this Work and the Owner shall not be liable for any charge in excess of the maximum. Daily time sheets of all Contractor's employees working on the Project will be required to be submitted to the Owner for both labor and equipment used by the Contractor for time periods during which changed Work is performed on a cost plus fee basis. Daily time sheets will break down the paid hours worked by the Contractor's employees showing both base contract work as well as changed work performed by each employee. If such proposals are not received in a timely manner, if the proposals are not acceptable to Owner, or if the changed Work should be started immediately to avoid damage or delay to the Project, the Owner may direct the Contractor to proceed with the changes without waiting for the Contractor's proposal or for the formal Change Order to be issued. In the case of an unacceptable Contractor proposal, the Owner may direct the Contractor to proceed with the changed Work on a cost-plus basis with an agreed upon "not-to-exceed" price for the Work to be performed. Such directions to the Contractor by the Owner shall be confirmed in writing by a "Notice to Proceed on Changes" letter within seven (7) days.
The cost or credit and any time extension will be determined by negotiations as soon as practical thereafter and incorporated in a Change Order.

7.6     Subcontract Buy-Outs.   The Contractor shall not engage in the practice of inflating Change Order proposals (generally known as buyouts) by submitting Subcontractor prices to the Owner that are higher than the Contractor's actual known Subcontract costs. Each component of a proposed Change Order affecting the Contract Sum shall be supported by an underlying cost element and documentation evidencing actual costs. Where a Subcontract price has been obtained that is lower than what was submitted in an original proposed Change Order (for whatever reason or through whatever means), the Contractor shall pass along such savings to the Owner. If the lower price is obtained prior to the execution of a Change Order, such savings shall be incorporated into the proposed Change Order prior to execution. If a Change Order has already been executed, a deductive Change Order shall be issued to the Owner for the difference.

7.7     Differing Site Conditions. If concealed and unknown subsurface conditions are encountered in the performance of the Work and such conditions differ materially from those affirmatively represented in Owner-provided soil borings, surveys and other documents describing the physical characteristics of the Site, if any, or are of an unusual nature, differing materially from those ordinarily encountered on projects in the same locale as the Project, the Contract Time and the Contract Sum shall be adjusted by Change Order upon written claim by the Contractor, but only if the claim is made within seven (7) days after the condition is first discovered.  No adjustment in the Contract Time or Contract Sum shall be permitted if the condition does not differ materially from conditions that should have been discovered by the Contractor pursuant to inspections or tests that the Contractor had the opportunity to make in connection with the Project.

7.8     Forms. The form and content of reoccurring documents (i.e. Change Orders, work orders, reports and timesheets) may be designated by the Owner, and the Contractor agrees to use such forms.

## ARTICLE 8
## SAFETY

8.1    <u>Contractor Responsibility</u>. The Contractor recognizes the importance of performing the Work in a safe manner and to prevent damage, injury or loss to individuals at the Site, whether working or visiting, to materials and equipment incorporated into the Work or stored on-Site, and to the Work and other property at or adjacent to the Site.

8.1.1    <u>Safety Precautions and Programs.</u>  The Contractor shall assume responsibility for implementing and monitoring all safety precautions and programs relating to the performance of the Work.  At a minimum, the Contractor shall comply with the safety requirements of Division 1 of the Specifications, other safety requirements and regulations set forth elsewhere in the Contract Documents, and applicable Legal Requirements.

8.1.2    <u>Safety Representatives.</u>  Before commencing Work, the Contractor shall designate an employee who shall be responsible for the implementation of safety-related precautions and programs.  The safety representative shall make routine inspections of the Site and shall hold weekly safety meetings with the Contractor's personnel and the Subcontractors to promote Project safety.  A safety representative employed by the Owner or an insurer may, from time to time, conduct safety inspections and submit safety findings.  The Contractor shall implement any reasonable abatement procedures recommended by such safety representatives.

8.1.3    <u>Reporting.</u>  The Contractor shall immediately report in writing to the Owner and the Contractor's liability insurers any Project-related accidents and, to the extent required by Legal Requirements, to governmental authorities having jurisdiction over the Site.

8.2    <u>Hazardous Conditions</u>.

8.2.1    <u>Pre-existing Conditions.</u>  Unless otherwise provided in the Contract Documents, the Contractor shall not be responsible for pre-existing Hazardous Conditions encountered at the Site.  Upon encountering a Hazardous Condition, the Contractor shall stop Work immediately in the affected area and notify the Owner and, if required by Legal Requirements, governmental authorities having jurisdiction over the Site.  The Contractor shall resume Work at the affected area after written certification that the Hazardous Condition does not exist or has been remediated and necessary approvals have been obtained.

8.2.2    <u>Other Conditions.</u>  Notwithstanding subparagraph 8.2.1, the Owner shall not be responsible for Hazardous Conditions which were created subsequent to the date of this Agreement or introduced to the Site by the Contractor, its Subcontractors or anyone for whose acts they may be liable.  Substances which may create a Hazardous Condition shall not be used without the approval of the Owner.  The Contractor shall defend and indemnify the Owner and the lenders from and against all damages, costs and expenses, including attorneys' fees, arising out of or resulting from such Hazardous Conditions.

8.2.3    <u>Notice.</u>  If Hazardous substances are of a type of which an employer is required by Legal Requirements to notify its employees, the Contractor shall, prior to possible exposure, provide written notice of the detailed chemical composition thereof to the Owner and the Contractor's employees and Subcontractors and their employees.

## ARTICLE 9
## INSURANCE

9.1    <u>Contractor's Liability Insurance</u>. The Contractor shall maintain the insurance coverages outlined below at its sole cost and expense, with insurers licensed to do business in the state in which the Project is located. The insurers must have a minimum AM Best rating of A- VIII.   The Contractor's use of blanket policies covering more than one location or the use of any self-insurance to satisfy the Contractor's insurance requirements must be fully disclosed and approved by the Owner in writing.  Acceptance by the Owner of either of these does not release the Contractor of any requirements regarding limits or coverages required.  In

the event the Contractor fails to procure, maintain, or pay for the required insurance as required by this Agreement, the Owner shall have the right but not the duty or obligation to procure such insurance and pay the premiums, in which event the Contractor shall repay the Owner immediately on demand, including all sums so paid by the Owner, together with interest and any costs or expenses incurred by the owner.

9.1.1   Waiver of Subrogation.  All of the Contractor's insurance policies shall include a waiver by the insurance company of all rights against the Owner, its agents, directors, partners, officers, and employees that arise or might arise by reason of any payment under any policies carried by the Contractor or by reason of any act or omission of the Owner, its directors, partners, officers, employees, agents, or representatives.

9.1.2   Certificates of Insurance.  Certificates of Insurance shall be provided to the Owner, evidencing that the required insurance has been obtained.  The policies shall not be cancelled, not renewed, or changed in any material way without first giving the Owner thirty (30) days' prior, written notice by certified, registered mail. All insurance procured/maintained by the Contractor shall be primary.  Any insurance available to the Owner shall be considered excess and non-contributory. Any deductible or self-insured retention amounts are the sole responsibility of the Contractor.  The insurance requirements set forth are in no way intended to modify, reduce, or limit the indemnifications herein made by the Contractor. The insurance coverages and limits required of the Contractor (and its Subcontractors) are designed to meet the minimum requirements of the Owner and are not designed as a recommended insurance program for the Contractor.  The Contractor alone shall be responsible for the sufficiency of its own insurance program.  Should the Contractor have any questions concerning its exposures to loss under this Agreement or the possible insurance coverages required, it should seek professional assistance. Any actions, errors, or omissions that may invalidate coverage for the Contractor insured shall not invalidate or prohibit coverage available to any other insureds.

9.1.3   Additional Insured.  The Certificates for the commercial general liability, automobile liability and any umbrella or excess liability policies provided by the Contractor and the Subcontractors shall name the Owner and the Owner's lenders as additional insureds, and as additional insureds for claims caused in whole or in part by the Contractor's or Subcontractors' negligent acts or omissions during completed operations.  The additional insured endorsement shall state that coverage is afforded the additional insureds as primary and non-contributory.

9.1.4   Insurance Limits.  Shall include completed operations coverage with the following minimum coverages and limits maintained for a minimum of 24 months following the completion of the Project.

.1      Commercial General Liability Insurance.

| | |
|---|---|
| $2,000,000 | Per Occurrence Bodily Injury and Property Damage |
| $2,000,000 | Per Occurrence Personal and Advertising Injury |
| $2,000,000 | General Aggregate |
| $2,000,000 | Products and Completed Operations Aggregate |

General Aggregate to apply on a per-project basis.  The policy shall not contain any exclusions, except those customarily contained within the coverage form on such policies.

.2      Commercial Automobile Liability.  In the amount of $2,000,000 combined single limit for bodily injury and property damage, covering all owned, non-owned, or hired automobiles used in the course of the Contractor's business.

.3      Workers' Compensation.  In compliance with any and all statutes requiring such coverage in the state where the Project is located, covering employees, volunteers, temporary workers, and leased workers. To the extent permitted by law, an Alternate Employer Endorsement shall be endorsed to the policy and evidenced on the required Certificate of Insurance.

.4      Employer's Liability.  In a minimum amount of $1,000,000 each accident, $1,000,000 each employee, $1,000,000 policy aggregate, covering all employees, volunteers, temporary employees, and leased employees.

.5      Umbrella or Excess Liability. In a minimum amount of $10,000,000 per occurrence, providing limits above the required Commercial General Liability, Commercial Automobile Liability, and Employer's Liability primary limits.

.6      Pollution Liability. A minimum limit of not less than $5,000,000 per occurrence for bodily injury, property damage, and clean-up costs, including coverage for any claim, suit, penalty, fine, or demand brought by any third party or on behalf of any governmental agency or authority, as a result of the actual, alleged, or threatened discharge, disposal, seepage, migration, release, or escape of any hazardous material or pollutant. The policy shall contain a deductible no greater than $50,000 and shall name both the Owner and the Contractor as insureds. Any deductible or self-insured retention amounts are the sole responsibility of the Contractor.

9.2      Subcontractor's Insurance. All Subcontractors shall maintain the same insurance coverages, and under the same terms and conditions, as is required of the Contractor in this Agreement, except that (1) their commercial automobile liability insurance limits shall be in the amount of $1,000,000 per occurrence, (2) their umbrella or excess liability insurance limits shall be in the minimum amount of $3,000,000 per occurrence, providing limits above the required Commercial General Liability, Commercial Automobile Liability, and Employer's Liability primary limits, and (3) their pollution liability insurance limits shall be in the amount of $3,000,000 per occurrence.

9.3      Builder's Risk Insurance.

9.3.1      Contractor Responsibility. The Contractor shall purchase and maintain "builder's risk" property insurance in a form acceptable to the Owner. This insurance shall include as named insureds the Owner, the Contractor, the lender, if applicable, and the Subcontractors, as their interests may appear. The insurance shall provide "all risk" coverage and shall include the perils of fire (with extended coverage), theft, vandalism, malicious mischief, transit, collapse, flood, earthquake, soft costs and testing. Certificates of Insurance showing such coverages to be in force shall be delivered to the Owner prior to the commencement of construction.

9.3.2      Deductibles. If the Contractor makes a claim covered by the Builder's Risk property insurance policy for the Project and pays the deductible required under the Builder's Risk property insurance policy, the Owner may either issue a Change Order to increase the Contract Sum or reimburse the Contractor directly. The deductible shall not exceed $25,000.

9.3.3      Proceeds. Any loss covered under the Builder's Risk property insurance policy shall be made payable to the Owner, subject to any applicable mortgage or loan clause. Insurance proceeds will be distributed in accordance with an agreement reached between the interested parties. Any disagreement concerning the distribution of proceeds shall be resolved in accordance with Article 10.

9.3.4      Excluded Items. The Builder's Risk property insurance policy may not cover any tools, apparatus, machinery, scaffolding, hoists, forms, staging, shoring, and other similar items that may be on the Site. The Contractor shall make its own arrangements for any insurance it may require to protect such items. The Contractor waives all claims and rights of subrogation against the Owner for loss of or damage to such items.

9.3.5      Waiver of Subrogation. The Owner and the Contractor waive all rights against each other and their employees, Subcontractors, and separate contractors for damages to the extent covered by the Builder's Risk property insurance, except their rights to the insurance proceeds. The Contractor shall require similar waivers of its Subcontractors. The Owner shall require similar waivers of its separate contractors.

9.4      Recommendations of Insurers. The Contractor and the Owner shall cooperate and comply with all reasonable requirements and recommendations of the insurers and insurance brokers issuing or arranging for issuance of the insurance policies required by this Article 9, including requirements and recommendations relating to safety, insurance program administration, claims reporting and investigation, and audit procedures.

## ARTICLE 10
## DISPUTES

10.1   <u>Claims.</u>  The Contractor shall make all claims for an increase in the Contract Sum or the Contract Time in accordance with the Contract Documents and in strict compliance with the procedures provided below.  If the Contractor claims that it is entitled to additional sums or time, for any reason whatsoever, the Contractor shall give the Owner written notice of the claim within ten (10) days after the occurrence giving rise to the claim or within ten (10) days after the Contractor first recognizes the condition giving rise to the claim, whichever is later. The notice of the claim shall set forth the circumstances giving rise to the claim, and to the extent reasonably available, facts, documents, backup data and other information supporting the claim and the relief sought.  Failure by the Contractor to provide written notice of the claim shall result in a waiver of the claim.  Within thirty (30) days after providing written notice of a claim, the Contractor shall submit complete support for the claim including without limitation documents, backup data and other information supporting the claim, the relief sought, and those persons with knowledge of the claim.  No additional sums shall be paid to the Contractor, and no additional time shall be granted or recognized, unless the Contractor has received a written Change Order signed by the Owner.  VERBAL CHANGES OR EXTRAS SHALL NOT BE VALID OR ENFORCEABLE.

10.2   <u>Stepped Negotiation</u>.  If a dispute arises out of or relates to the Project, the Work, the Contract Documents or this Agreement or any breach thereof, the parties shall endeavor to settle the dispute first through direct discussions between the parties' representatives who have the authority to settle the dispute. If the parties' representatives are not able to promptly settle the dispute, the executives of the parties, who shall have the authority to settle the dispute, shall meet within twenty-one (21) days after the dispute first arises. If the dispute is not settled within seven (7) days from the referral of the dispute to the parties' executives, the parties shall submit the dispute to mediation in accordance with paragraph 10.3.

10.3   <u>Mediation.</u>  The parties shall attempt in good faith to resolve their disputes by mediation in accordance with the Construction Industry Mediation Rules of the American Arbitration Association currently in effect.  A request for mediation shall be filed in writing with the other party and the American Arbitration Association.  If requested by the Owner, mediation shall proceed as a condition precedent to legal or equitable proceedings.  The parties shall share the mediator's fee and expenses equally.  The mediation shall be held at or near the Site.  Agreements reached in mediation shall be in writing and shall be enforceable.

10.4   <u>Continued Performance.</u>  Unless directed otherwise by the Owner in writing, the Contractor shall continue performance of the Work pending the resolution of a dispute.  The existence of a dispute shall not justify delay or suspension of the Work by the Contractor.  The Contractor's failure to proceed shall constitute a material breach of this Agreement by the Contractor regardless of the ultimate outcome of the dispute.

## ARTICLE 11
## REMEDIES

11.1   <u>Default</u>.  If, in the reasonable opinion of the Owner, the Contractor or its Subcontractors fail to provide a sufficient number of properly skilled laborers or fail to prosecute the Work according to the Project Schedule, or materially delay, disrupt or interfere with the work of the Owner or separate contractors, or if the Contractor fails in any material respect to comply with any other provisions of the Contract Documents, makes a general assignment for the benefit of creditors, has a receiver appointed, or becomes insolvent (collectively, "Default"), the Owner may, after forty-eight (48) hours written notice to the Contractor:

.1   take such steps to correct, cure or overcome the Default as the Owner deems expedient, and charge all damages, costs and expenses, including attorney's fees, to the Contractor; or

.2   terminate this Agreement.

If the Owner terminates this Agreement, the Owner may complete the Work by whatever method the Owner deems prudent.  If sums paid to or on behalf of the Contractor, costs paid to complete the Work, and damages,

costs and expenses incurred by the Owner, including attorney's fees, exceed the Contract Sum, the Contractor shall pay the difference to the Owner.

11.2    Bankruptcy.  If the Contractor institutes or has instituted against it a case under the United States Bankruptcy Code, such event will impair or frustrate the Contractor's ability to perform its obligations under the Contract Documents.  Accordingly, should such event occur:

.1    The Contractor, its trustee or other successor, shall furnish, upon request of the Owner, adequate assurance of the ability of the Contractor to perform all future material obligations under the Contract Documents, which assurances shall be provided within ten (10) days after receiving notice of the request; and

.2    the Contractor shall file appropriate motions or requests with the bankruptcy court to seek assumption or rejection of this Agreement within ten (10) days of the institution of the bankruptcy filing and shall diligently pursue such relief.

If the Contractor fails to comply with these obligations, the Owner shall be entitled to move or request the bankruptcy court to reject this Agreement, declare this Agreement terminated and permit the Owner to pursue any other recourse available to the Owner.

11.3    Convenience Termination.  The Owner may, at any time and for its convenience, terminate this Agreement.  Upon receipt of written notice of termination, the Contractor shall cease operations as directed by the Owner in the notice, take actions necessary, or as the Owner may direct, for the protection and preservation of the Work, and terminate all existing subcontracts, purchase orders and agreements.  If the Contractor is not in Default, the Contractor shall receive, as full compensation, the Cost of the Work plus the Fee for Work performed to the date of termination.   The Contractor waives and relinquishes all other claims for payment and damages, including but not limited to anticipated or lost profits.

11.4    Assignments.  Each Subcontract is assigned by the Contractor to the Owner provided that assignment is effective only after termination of this Agreement by the Owner and only for those Subcontracts which the Owner accepts by notifying the Subcontractor and the Contractor in writing. Upon such assignment to the Owner, the Owner may further assign the Subcontract to a successor or other entity.


SIGNATURES

By executing this Agreement, the Owner and the Contractor each represent that it has the necessary financial resources to fulfill its obligations under this Agreement and the necessary legal and corporate approvals to execute this Agreement.


OWNER:                                              CONTRACTOR:

Shopping Center Associates                          Scungio Borst & Associates

_____ 5·3·21                    _____
(Signature)                                         (Signature)
Michael E. McCarty                                      Scott P. Scungio
(Printed Name)                                      (Printed Name)
President, Simon Development                             Principal, Scungio Borst
(Title)                                             (Title)

**EXHIBIT A**
**CONSTRUCTION DOCUMENTS**

- Gilligan & Bubnowski, Architects (11/20/19)
- Pennoni (10/04/19)
- Project Specifications (08/01/19)
- Edison Restaurants – TFK and SS – Geotech Report (07/24/19)

**EXHIBIT B**
**THE PROJECT TEAM**

1.    Contractor's Project Manager: **Will Elia (856) 718-4838** welia@scungioborst.com
(same person as identified in subparagraph 1.3.2)

2.    The Contractor's Superintendent: **Pat Rissi (856) 834-0527  prissi@scungioborst.com**

3.    Owner's Project Manager:  **John Woods (317) 263-7172  jwoods@simon.com**

**EXHIBIT C**
**THE PROJECT SCHEDULE**
**(attached)**

| Menlo Park Mall - Restaurant Development - Updt -6 | | | | | Scungio Ongoing Schedule | | Date of Print:09-Mar-21 13:03 |
| Proj. ID:1902002- Updt -6 | | | | | | 1/2 | Data Date:01-May-21 |



| Activity ID | Activity Name | Original Duration | Remaining Duration | Total Float | Activity % Complete | Start | Finish | Responsib |
|---|---|---|---|---|---|---|---|---|
| Menlo Park Mall - Restaurant Development - Updt -6 | | 449 | 131 | 0 | | 04-Feb-20A | 04-Nov-21 | |
| Pre- Construction | | 0 | 0 | 14 | | 03-May-21 | 03-May-21 | |
| PR120 | Building Permit Issued | 0 | 0 | 14 | 0% | 03-May-21* | 03-May-21 | |
| Subcontracting | | 20 | 10 | 62 | | | 04-Feb-20A | 14-May-21 | |
| SC160 | Roofing | 11 | 10 | 62 | 9.09% | 04-Feb-20A | 14-May-21 | |
| SC190 | Carpenty | 19 | 10 | 48 | 47.37% | 05-Feb-20A | 14-May-21 | |
| SC250 | Metal Panels | 11 | 10 | 16 | 9.09% | 04-Feb-20A | 14-May-21 | |
| Permits | | 20 | 20 | 64 | | 03-May-21 | 28-May-21 | |
| PT100 | Mech. Permit | 20 | 20 | 64 | 0% | 03-May-21 | 28-May-21 | OWNR |
| PT110 | Elec. Permit | 20 | 20 | 64 | 0% | 03-May-21 | 28-May-21 | OWNR |
| PT120 | Plumbing. Permit | 20 | 20 | 64 | 0% | 03-May-21 | 28-May-21 | OWNR |
| PT130 | Sprinkler. Permit | 20 | 20 | 64 | 0% | 03-May-21 | 28-May-21 | OWNR |
| Submittals / Approvals (allowing a 5 day review) | | 338 | 25 | 71 | | 04-Feb-20A | 07-Jun-21 | |
| SU110 | Sitework | 10 | 2 | 17 | 80% | 04-Feb-20A | 04-May-21 | |
| SU120 | Concrete | 10 | 5 | 22 | 50% | 02-Mar-20A | 07-May-21 | |
| SU150 | Masonry | 10 | 1 | 13 | 90% | 02-Mar-20A | 03-May-21 | |
| SU200 | MEP | 15 | 25 | 59 | 0% | 02-Mar-20A | 07-Jun-21 | |
| SU140 | Steel | 12 | 12 | 18 | 0% | 03-May-21* | 18-May-21 | |
| SU170 | EIFS | 10 | 10 | 86 | 0% | 03-May-21* | 14-May-21 | |
| SU190 | Glazing | 10 | 10 | 54 | 0% | 03-May-21* | 14-May-21 | |
| SU220 | Tile | 10 | 10 | 66 | 0% | 03-May-21* | 14-May-21 | |
| SU230 | Painting | 5 | 5 | 61 | 0% | 03-May-21* | 07-May-21 | |
| SU160 | Roofing | 5 | 5 | 62 | 0% | 17-May-21 | 21-May-21 | |
| SU180 | Carpentry | 7 | 7 | 46 | 0% | 17-May-21 | 25-May-21 | |
| SU210 | Metal Panels | 10 | 10 | 16 | 0% | 17-May-21 | 28-May-21 | |
| Long Lead Items | | 80 | 80 | 16 | | 03-May-21 | 24-Aug-21 | |
| LL130 | Door Frames & Hardware | 15 | 15 | 19 | 0% | 03-May-21 | 25-May-21 | |
| LL100 | Masonry | 20 | 20 | 13 | 0% | 04-May-21 | 01-Jun-21 | |
| LL110 | Water Quality Management Structure | 15 | 15 | 56 | 0% | 05-May-21 | 25-May-21 | |
| LL120 | Glazing | 30 | 30 | 54 | 0% | 17-May-21 | 28-Jun-21 | |
| LL170 | Porcelain Tile | 20 | 20 | 66 | 0% | 17-May-21 | 14-Jun-21 | |
| LL160 | Steel | 20 | 20 | 18 | 0% | 19-May-21 | 16-Jun-21 | |
| LL140 | Canopy / Fascia | 60 | 60 | 16 | 0% | 01-Jun-21 | 24-Aug-21 | |
| LL150 | Metal Panels | 20 | 20 | 56 | 0% | 01-Jun-21 | 29-Jun-21 | |
| Construction | | 430 | 126 | 0 | | 24-Feb-20A | 28-Oct-21 | |
| Sitework | | 383 | 79 | 47 | | 24-Feb-20A | 23-Aug-21 | |
| CS100 | Site Demolition | 10 | 8 | 1 | 60% | 24-Feb-20A | 25-May-21 | |
| CS240 | Earthwork | 21 | 21 | 0 | 0% | 03-May-21* | 01-Jun-21 | |
| CS120 | Temporary Power | 0 | 0 | 17 | 0% | 03-May-21* | | |
| CS130 | Site Utilties - Sanitary Sewer | 8 | 8 | 0 | 0% | 26-May-21 | 07-Jun-21 | |
| CS230 | Removing of Existing Site Sewers Under Pad | 5 | 5 | 0 | 0% | 28-May-21 | 04-Jun-21 | |
| CS140 | Water Quality Management Structure -Storm Sewer | 11 | 10 | 47 | 0% | 09-Jun-21 | 23-Jun-21 | |
| CS150 | Irrigation Systems | 10 | 10 | 70 | 0% | 08-Jun-21 | 21-Jun-21 | |
| CS250 | Site Utilties - Water | 2 | 2 | 47 | 0% | 23-Jun-21 | 24-Jun-21 | |
| CS260 | Site Utilties - Elec. Power | 10 | 10 | 67 | 0% | 23-Jun-21 | 07-Jul-21 | |
| CS160 | Site Concrete - Street & Parking Lot | 10 | 10 | 47 | 0% | 25-Jun-21 | 09-Jul-21 | |
| CS170 | Site Concrete - Building Curbs & Sidewalk | 10 | 10 | 47 | 0% | 09-Jul-21 | 23-Jul-21 | |
| CS180 | Sub base and Base Coat Paving for entire Site | 8 | 8 | 47 | 0% | 26-Jul-21 | 04-Aug-21 | |

Remaining Level of Effort
Actual Level of Effort
Actual Work
Remaining Work
Critical Remaining Work
Milestone
summary

proj 1902002- Menlo Park Mall - Restaurant Development
Ongoing Sch- Resume Date 5/1/21

Scungio Borst
CONSTRUCTION MANAGEMENT



| Activity ID | Activity Name | Original Duration | Remaining Duration | Total Float | Activity % Complete | Start | Finish | Responsible |
|---|---|---|---|---|---|---|---|---|
| CS190 | Permanent Power | 0 | 0 | 47 | 0% | 05-Aug-21 | | |
| CS200 | Parking Lot Lighting | 8 | 8 | 47 | 0% | 05-Aug-21 | 16-Aug-21 | |
| CS210 | Final Coat Asphalt/Striping | 5 | 5 | 47 | 0% | 17-Aug-21 | 23-Aug-21 | |
| CS220 | Landscaping | 5 | 5 | 47 | 0% | 17-Aug-21 | 23-Aug-21 | |
| **Fragnet#1: Unforeseen Grade Beams and Soil Cement Dem.** | | 12 | 12 | 1 | | 03-May-21 | 18-May-21 | |
| FRAG-100 | Unforeseen Grade Beams and Soil Cement Discovery | 1 | 1 | 1 | 0% | 03-May-21* | 03-May-21 | |
| FRAG-110 | Issue RFI/5 Unforseen Grade Beams and Soil Cement | 1 | 1 | 1 | 0% | 04-May-21 | 04-May-21 | |
| FRAG-120 | RFI# 5 Response | 3 | 3 | 1 | 0% | 05-May-21 | 07-May-21 | OWNR |
| FRAG-130 | Issue Pricing for Review | 5 | 5 | 1 | 0% | 10-May-21 | 14-May-21 | |
| FRAG-140 | Pricing Approval | 2 | 2 | 1 | 0% | 17-May-21 | 18-May-21 | OWNR |
| **Building Construction** | | 102 | 102 | 0 | | 07-Jun-21 | 28-Oct-21 | |
| CB100 | Setting Building Pad | 3 | 3 | 0 | 0% | 07-Jun-21 | 09-Jun-21 | |
| CB120 | Footing/Foundations | 7 | 7 | 0 | 0% | 10-Jun-21 | 18-Jun-21 | |
| CB130 | CMU Construction | 16 | 16 | 0 | 0% | 21-Jun-21 | 13-Jul-21 | |
| CB140 | Steel Construction | 15 | 15 | 0 | 0% | 14-Jul-21 | 03-Aug-21 | |
| CB150 | Framing Building Interior | 10 | 10 | 19 | 0% | 04-Aug-21 | 17-Aug-21 | |
| CB170 | Framing Exterior | 17 | 17 | 0 | 0% | 04-Aug-21 | 26-Aug-21 | |
| CB180 | Underslab Plumbing | 5 | 5 | 52 | 0% | 04-Aug-21 | 10-Aug-21 | |
| CB190 | Slab Prep (Stone and Insulation) | 4 | 4 | 52 | 0% | 11-Aug-21 | 16-Aug-21 | |
| CB200 | Roofing | 10 | 10 | 0 | 0% | 20-Aug-21 | 02-Sep-21 | |
| CB210 | Glazing | 6 | 6 | 12 | 0% | 27-Aug-21 | 03-Sep-21 | |
| CB200 | MEPS | 15 | 15 | 0 | 0% | 31-Aug-21 | 21-Sep-21 | |
| CB220 | Exterior Finishes | 30 | 30 | 0 | 0% | 17-Sep-21 | 28-Oct-21 | |
| **Closeout** | | 32 | 32 | 0 | | 21-Sep-21 | 04-Nov-21 | |
| CO100 | Beneficial Occupancy for Owner Contractors for Fit-Out Work | 0 | 0 | 0 | 0% | 21-Sep-21* | | OWNR |
| CO110 | Project Substantially Complete | 0 | 0 | 0 | 0% | 28-Oct-21 | | |
| CO120 | Owner Punch Work | 5 | 5 | 0 | 0% | 29-Oct-21* | 04-Nov-21 | |

Menlo Park Mall - Restaurant Development - Updt -6
Proj. ID:1902002- Updt -6

Scungio: Ongoing Schedule
2/2

Date of Print:09-Mar-21 13:03
Data Date:01-May-21

Remaining Level of Effort — Remaining Work — summary
Actual Level of Effort — Critical Remaining Work
Actual Work — ◆ Milestone

proj 1902002- Menlo Park Mall - Restaurant Development
Ongoing Sch- Resume Date 5/1/21

Scungio◆Borst
CONSTRUCTION MANAGEMENT

## EXHIBIT D-1
## THE SCHEDULE OF VALUES WITH DETAIL

| PROJECT NAME: | Menlo Park Mall-Multi-Tenant |
|---|---|
| MALL NAME: | Menlo Park Mall |
| CORP. # | 4666 |
| SQUARE FEET: | 9,955 |
| LOCATION: | 'Route 1 & Parsonage Rd. |
| GENERAL CONTRACTOR | Scungio Borst & Associates |

# CONSTRUCTION CONTRACT SCHEDULE OF VALUES - DETAIL

| | COST CODE | DESCRIPTION | Revised Sitework | COMMENTS |
|---|---|---|---|---|
| 1 | 100000 | General Conditions | $194,934.00 | |
| 2 | 101155 | Insurance-Liability | $35,872.00 | |
| 3 | 101150 | Insurance-Builder's Risk | $9,891.00 | |
| 4 | 302050 | Demolition - On-Site | $54,250.00 | |
| 5 | 302200 | Earthwork - On-Site | $119,505.00 | |
| 6 | 302210 | Grading | In Earthwork | |
| 7 | 302500 | Paving and Surfacing | $536,940.00 | |
| 8 | 302660 | Water Distribution - On-Site | $38,650.00 | |
| 9 | 302720 | Storm Sewage Systems - On-Site | $417,793.00 | |
| 10 | 302730 | Sanitary Sewage Systems - On-Site | $87,001.00 | |
| 11 | 302785 | Elect Power Transmission - On-Site | $62,051.00 | |
| 12 | 302810 | Irrigation Systems - On-Site | $36,430.00 | |
| 13 | 302900 | Landscaping - On-Site | $52,220.00 | |
| 14 | 403001 | Concrete - Building | $146,940.00 | |
| 15 | 403310 | Structural Concrete - Foundation | NIC | |
| 16 | 403320 | Concrete, Sidewalks - Building | In CIP | |
| 17 | 404001 | Masonry | $86,380.00 | |
| 18 | 405120 | Metal, Structural Steel | $449,201.00 | |

SPG FORM GC-2 (LS) (06/17/2019)

| # | Code | Description | Cost |
|---|---|---|---|
| | | **TOTAL COST** | **3,596,100.40** |
| | | | $3,596,101.00 |
| 36 | 518922 | GC Construction Fees, Commit. - External | $128,206.00 |
| 35 | 416720 | Alarm & Detection System | In Electrical |
| 34 | 416520 | Elec, Exterior Lighting | In Electrical |
| 33 | 416001 | Electrical - Building | $148,700.00 |
| 32 | 415500 | HVAC | $6,122.00 |
| 31 | 415400 | Mech, Plumbing | $97,070.00 |
| 30 | 415300 | Mech, Fire Protection | $35,000.00 |
| 29 | 409910 | Finishes, Painting, Exterior | $368,239.00 |
| 28 | 408700 | Hardware | In D/F |
| 27 | 408400 | Entrances and Storefronts | $142,825.00 |
| 26 | 408300 | Doors, Special | NIC |
| 25 | 408100 | Doors and Frames, Metal | $ - |
| 24 | 407900 | Roofing, Joint Sealers | $4,800.00 |
| 23 | 407610 | Roofing, Sheet Metal | $139,000.00 |
| 22 | 407510 | Roofing, Membrane | $168,571.00 |
| 21 | 407210 | Insulation, Building | $29,610.00 |
| 20 | 405300 | Metal Decking | In Structural |
| 19 | 405210 | Metal, Steel Joists | In Structural |

## EXHIBIT D-2
## ALLOWANCES

- Block Planter: $4,500.00

**EXHIBIT D-3**
**GLOBAL RISK CHECKLIST**
**(attached)**



**Global Risk Consultants®**



# Construction Checklist

<u>**Roofing**</u>

☐ Calculate wind uplift for roofing system attachment and steel deck securement per FM Global Data Sheet 1-28 or use the FM RoofNav Ratings Calculator available at www.RoofNav.com site. Specify a roofing system appropriate for the specific project (Class 1-60, 1-75, 1-90, 1-105, etc.) based upon the required wind uplift for the "Field" (Zone 1) of the roof. (*FM Class 1-90, which is common place <u>does not</u> mean it is for 90 mph maximum wind speeds. Most non-coastal areas of US are adequate with FM Class 1-60 or 1-75.*)

  · Use FM Global surface roughness definitions, which are slightly different than ASCE-7. (Typically "C" due to the clearing and large parking lots.)

  • Determine Surface Roughness Exposure

*Surface roughness exposure B:* Urban and suburban areas, wooded areas, or other terrain with numerous closely spaced obstructions having the size of single-family dwellings or larger. Use of this exposure category should be limited to those areas for which terrain representative of surface roughness B prevails in all directions for a distance of at least 2600 ft (792 m) or 20 times the height of the building or other structure, whichever is greater. Limited openings in this surface roughness, such as parking lots, wide roads, road intersections, playing fields, underdeveloped lots, and tree clearings can be tolerated in surface roughness exposure B. (Exception: When such clearings exceed 600 ft [183 m] in total length measured in the direction perpendicular to the building and exceed 164 ft [50 m] in width, use surface roughness exposure C). For buildings whose mean height is less than or equal to 30 ft (9.1 m), the prevailing exposure B distance may be reduced to 1500 ft (460 m). In cases where the difference between exposures B and C is not obvious, use exposure C.

*Surface roughness exposure C:* Open terrain with scattered obstructions having heights generally less than 30 ft (9.1 m), such as flat, open country and grasslands, water surfaces in hurricane-prone regions where the basic wind speed is greater than or equal to 120 mph (54 m/s), and in all cases where exposures B or D do not apply. This also includes surface roughness exposure B terrain that is interrupted by clearings (parking lots, wide roads, road intersections, playing fields, underdeveloped lots, tree clearings, etc.) of greater than 600 ft (183 m) in total length measured in the direction perpendicular to the building and exceeding 164 ft (50 m) in width. In cases where the difference between exposures B and C is not obvious, use exposure C.

  · Use an Importance Factor of 1.15 for components, cladding and secondary structural framing per FM Global Data Sheet 1-28, §2.2 (Roof Design Loads).

  · Parapets 3-ft or higher around the <u>entire</u> perimeter of the building affect wind uplift calculations at the "Corners" (Zone 3).

☐ Roofing system designed and specified per FM Global Data Sheets 1-28 and 1-29.

  · Class A exterior fire exposure rating.

  · Non-combustible or Class 1 interior fire exposure rating.

  · Mechanically fastened.

  · No ballasted roofing systems.

  · Select Moderate (MH) or Severe (SH) Hail Rating per FM Global Data Sheet 1-29, Figure 1 of Data Sheet 1-34, Figure 3 (attached).

  · Roofing systems in hurricane-prone areas should be specified meet the performance criteria of FM Global Data Sheet 1-52. Contact GRC before testing.

 **Global Risk Consultants®**

 **SIMON**

☐ Specify an "FM Approved Roofing System" that includes all above-deck components.

- This ensures the installation uses components and systems (roof deck, insulation, fasteners, roof cover, etc.) that are FM Approved **for use together** on the particular deck. Use of individually FM Approved components, not FM Approved for use together, **does not** constitute an FM Approved or recommended assembly. Use of FM Approved systems is universally recommended and is implied for all applicable assemblies whether or not specifically stated. The selected roofing system must have a valid FM RoofNav Number.

- Steel roof decking should be "FM Approved" for proper span widths.

☐ Building structure exterior envelope in hurricane-prone (high wind) regions must be "fully enclosed."

- Building components (EFIS, siding, doors and glazing) meet the Small and/or Large Missile Impact Tests as described in FM Global Data Sheet 1-28, Appendix A.

- No gravel covered roofs in hurricane-prone regions.

☐ Roof flashing system designed and specified per FM Global Data Sheet 1-49.

- Roof flashing in "severe hail" regions requires *Wood Cant Strips* at the junction of the roof and parapet to prevent rupture of base flashing by hailstones per FM Global Data Sheet 1-34.

☐ Metal roofing systems designed and specified per FM Global Data Sheet 1-31.

☐ Skylights should be FM Approved per FM Standard 4431 and must be capable of meeting "Fall Protection" Regulatory Requirements.

- Skylights in "severe" hail regions should also be designed to meet Hail Impact Requirements per FM Global Data Sheet 1-34.

☐ Photovoltaic systems should be FM Approved per Standard 4478 and 4476.  Install per FM Global Sheet 1-15, NFPA 1 and NFPA 70.

☐ Green roofing systems should be FM Approved per FM Standard 4477 and installed per FM Global Data Sheet 1-35.

☐ Cite appropriate FM Global Approval Standards in the project specifications.
http://www.fmglobal.com/page.aspx?id=50030000

## Building Structure

☐ Non-combustible structure (IBC Types IV and V are not acceptable)

☐ The installation of standard EIFS on studs for walls and horizontal applications is strongly discouraged because the Property Insurance Industry rates EIFS similar to wood frame due to the fire hazard. EIFS should only be limited to cornices, trim, column coverings, etc.

- Where the use of EIFS walls and horizontal applications cannot be avoided, it should be applied over Gypsum (i.e., DensGlass Gold), Cement Board, or Concrete Block, and not over FR Plywood. The specified manufacturer's EIFS system should also pass NFPA 285 Fire Testing.

- EIFS used in Hurricane-Prone Areas should be reinforced for high impact resistance that is **equivalent** to that of FM Approved Wall Assemblies that have had "windborne debris tests" done per FM Standard 4881 section 4.3 to determine their FM Wind Zone Categories (HM, H or NH) for installations described in FM Global Data Sheet 1-29, §3.1.6 and Appendix A, (Small and/or Large Missile Impact Flow Chart).

- EIFS used in "severe" hail regions should be a high impact resistance design **equivalent** to that of FM Approved Wall Assemblies that have passed "hail tests" done per FM Standard 4881 section 4.4. (see FM Data Sheet 1-34, Figure 3 for hail regions)

☐ Structure must be designed for appropriate roofing system to be installed.

- Roof wind uplift is designed per FM Global Data Sheet 1-28.

- Structural Engineer should obtain free copy of FM Global Standard 4470 before designing the structure to understand maximum deck span width (bar joist spacing) when steel roof decking is





used as part of the roof design. The standard can be found at www.RoofNav.com then click on Reference Materials, then Approval Standards and finally 4470.

- FM Approved steel roof deck is required and should be specified as min. 33-ksi rather than ASTM. Obtain the latest FM Approved Maximum Span Width spreadsheets from the steel deck or roofing system manufacturers.

☐ Roof loading (rain & snow) design and roof drainage design per FM Global Data Sheet 1-54

- Primary and secondary drains. Secondary drains should have separate piping per FM Global Data Sheet 1-54, §2.5.4.1.7.5.1. (Simon requires drain covers in hurricane-prone regions to be painted "bright yellow" for visibility.)

- Use rainfall intensity (1-hr, 100-yr MRI) per FM Global unless local AHJ is greater.

## Sprinkler Protection

☐ Specify sprinkler system design and installation to meet the current edition of NFPA 13, *Standard for the Installation of Sprinkler Systems*.

- Sprinkler riser should be located inside a cutoff riser room accessible from outdoors, OR be controlled by a post-indicator-valve (PIV) or wall post-indicator-valve (WPIV) for safe access by emergency responders and mall management.

- Sprinklers in all areas, including beneath staircases, electrical rooms, hydraulic elevator pits and elevator equipment rooms.

- Check valves are required for all wet-pipe sprinkler systems.

- Pressure relief valves ½ in. 175 psi on all wet-pipe sprinkler systems. Install in vertical position.

- All mains and branch lines should be arranged for inspection by providing removable fittings.

- All fire system components specified as UL Listed and/or FM Approved.

- Seismic bracing, piping clearances and load calculations specified to meet NFPA-13 and ASCE/SEI 7 requirements in regions where required.

  o Sprinkler penetration holes through suspended ceiling systems require 1 in. (+2 in. dia.) clearance around the drops, articulating connections to allow 1 in. horizontal movement or the used of flexible hoses (ex. Flexheads or similar).

☐ Sprinkler risers and feedmains supplying new tenant sprinkler zones should be minimum 6 inch piping and be capable of flowing 1,000 gpm at residual pressure of 45 psi at the most remote ends of the feedmains. Hydraulic calculations should include 250 gpm for hose streams added at the appropriate location.

☐ If a fire pump is required, specify the fire pump design and installation to meet the current edition of NFPA-20, *Standard for the Installation of Stationary Pumps for Fire Protection* using UL Listed and/or FM Approved equipment.

☐ Specify sprinkler protection per the Owners Requirements published in *Fire Protection Design Requirement* and *Sprinkler Systems Technical Requirements* chapters of the Simon Property Group MEP Standards:

- New wet-pipe systems should be designed for 0.20-gpm/ft² over 1500-ft² as Ordinary Hazard Group 2 occupancies with 250-gpm for hose streams. This design includes mall concourse, hallways, food court, service corridors, entries, retail spaces and utility areas.

- Light Hazard designs of 0.10 gpm/ft² over 1500-ft² are prohibited except for offices, fitness areas and theater seating.

- Covered loading docks and delivery tunnels capable of parking box trucks and highway trailers designed for 0.30-gpm/ft² over 2500-ft² (wet) or 0.30-gpm/ft² over 3,250-ft² (dry) as Extra Hazard Group 1 occupancies with 500-gpm for hose streams.

- The installation of quick response (QR) sprinklers does not qualify for a reduction on design area.

 **Global Risk Consultants®**

 **SIMON**

- Shell space branch lines should not penetrate demising walls between tenant spaces.
- Install standard weight schedule 10 (roll grooved) or schedule 40 piping is an owner's requirement. No Thinwall or Lightwall piping regardless of listing/approval.
- FM Approved galvanized piping for dry-pipe systems installed except for areas where ambient temperatures could exceed 130°F.

☐ Specify the fire protection "storage" designs in Big Boxes and Warehouse Stores to meet the requirements of FM Global Data Sheet 8-9 using FM Approved "storage" sprinklers.

- Sprinkler design based upon actual roof/ceiling deck height, not a declared storage height.
- Design ceiling and fixture heights to allow 3 ft. clearance between the top of storage and sprinklers.
- If a fire pump is required, contact Jeff Wylie, Simon Manager MEP Engineering (317-263-7739, jeff.wylie@simon.com) before proceeding.

☐ Select sprinkler design densities from NFPA-13 for in-line retail storage areas (stockroom).

- Design ceiling and fixture heights to allow adequate clearance between the top of storage and sprinklers. Clearance may be 18 in. or 36 in. depending on the type sprinkler heads that will be installed.
- Fixed shelving systems should be no greater than 30-in. aisle-to-aisle to qualify for shelving protection requirements in NFPA-13.
- Most retail products are Class IV commodities or Plastics. NFPA-13 (Commodity Classification) requires protection for the highest hazard commodity when there are mixed commodities. We believe the following categories of tenants will have a heavy fire loading requiring a sprinkler design for Plastics when their products are placed >5-ft from the floor on displays, gondolas shelves or racks.

  - Athletic footwear stores
  - Appliance stores
  - Arts and Craft stores
  - Candle stores
  - Container stores
  - Costume stores
  - Electronic equipment stores
  - Entertainment / game stores
  - Furniture and mattress stores
  - Halloween and Christmas stores
  - Hardware stores

  - Home décor stores
  - Home furnishing stores
  - Household, bedding and bathware stores
  - Luggage stores
  - Music / record stores
  - Novelty stores
  - Office supply stores
  - Party supply stores
  - Pet stores
  - Shoe stores
  - Sporting goods stores

- Mobile (compact) shelving systems are treated as "multi-row" racks for protection purposes.

  o Solid shelf areas should be limited to ≤64-ft² by providing 6-in. minimum vertical flue spaces. This can be accomplished by providing minimum 6-in. vertical flue spaces between every-other rack. This can be implemented by installing 3-in. long "bumper extenders" on the rack uprights between rack sections – arrange these bumper extenders on "facing racks" such that they contact each other when the racks are closed.

  o Preferably, use an open rack arrangement for mobile (compact) shelving systems. This can be accomplished by installing wire mesh shelving.

## Fire Alarm System

☐ Specify fire alarm system design and installation to meet latest edition of NFPA-72 using UL Listed and/or FM Approved components.

☐ Install digital communicator to transmit alarm signals to a UL Listed and/or FM Approved central station monitoring company through telephone or radio means. (Use of IP communications between the protected property and the central station alarm company is outside the scope of NFPA-72, thus not acceptable.)

 **Global Risk Consultants**

 SIMON

The alarm system should monitor:

- o Sprinkler waterflow for all wet-pipe and dry-pipe systems

- o Electronic valve tamper supervision for fire system control valves 2½-in. or larger and those controlling 5 or more sprinklers.

- o Low riser room temperature in regions subject to prolonged freezing.

- o Low air pressure for dry-pipe systems

- o At least one manual pull station.

- o Smoke detection in electrical switchgear rooms, telephone rooms and in all rooms with fire alarm panels or alarm power supplies.

- o Smoke detectors are required to be installed in return air systems with a design capacity greater than 2,000-cfm, in the return air duct or plenum upstream of any filters, exhaust air connections, outdoor air connections, or decontamination equipment and appliances. These may be programmed as "supervisory" devices in the fire alarm panel, if they immediately shutdown the AHU.

- o Supervision of fire pumps (running, switch-off, phase reversal, overcrank, failure, etc.)

**Earthquake Regions**

☐ Seismic design requirements per FM Global Data Sheets 1-2 and 1-11:

- Listed/Approved automatic seismic shutoff valves for all natural gas supplies in earthquake regions.

- Flexible hose connections for gas-fired appliances, boilers and heaters.

- Suspended ceiling systems specified as medium or heavy duty rated and bracing, vertical struts, splay wires and proper wall molding.

- Clearance or soft insulation around gas piping passing through hard walls.

**Misc.**

☐ FM Approved fire and smoke stopping materials.

☐ FM Approved natural gas-fired equipment should be equipped with gas valves and combustion safety devices.

☐ Natural gas piping should be painted yellow or equipped with labels every 20 ft. per the requirements of ANSI 13.1.

☐ The overall building design should meet all regulatory requirements for fall protection. This applies to ladders, roof hatches, skylights, equipment installed near roof edges, etc.

☐ Roof top equipment in "severe" hail regions should be designed or shielded to resist large (3 in.) hailstones per the requirements of FM Global Data Sheet 1-34.

☐ Oil-filled transformers, regardless of ownership should be installed per FM Global Data Sheet 5-4 (Transformers), Table 2a. The spatial separation or two-hour fire resistance for mineral oil-filed also satisfy options (1) and (2) in NEC Article 450.27. Options (3) and (4) of NEC Article 450.27 are not considered adequate protection for high value Simon-owned properties. (EIFS is considered a "combustible construction" when applying the Table 2a.)





Table 2a.  Separation Distance Between Outdoor Liquid Insulated Transformers and Buildings

| Liquid | FM Approved Transformer or Equivalent | Liquid Volume, gal (m³) | Horizontal Distance [1] | | | Vertical Distance ft (m) |
|---|---|---|---|---|---|---|
| | | | Two Hour Fire Resistant Construction, ft (m) | Non-combustible Construction, ft (m) | Combustible Construction, ft (m) | |
| Less Flammable (FM Approved Fluid) | Yes | N/A | 3 (0.9) | | | 5 (1.5) |
| | No | ≤10,000 (38) >10,000 (38) | 5 (1.5) 15 (4.6) | | 25 (7.6) 50 (15.2) | 25 (7.6) 50 (15.2) |
| Mineral Oil or (unapproved fluid) | N/A | <500 (1.9) 500-5,000(1.9-19) >5,000 (19) | 5 (1.5) 15 (4.6) 25 (7.6) | 15 (4.6) 25 (7.6) 50 (15.2) | 25 (7.6) 50 (15.2) 100 (30.5) | 25 (7.6) 50 (15.2) 100 (30.5) |

(1)  All transformer components must be accessible for inspection and maintenance.

**Loss Prevention Reviews**

☐ Global Risk Consultants reviews Construction Documents (CD), Project Manual and Specifications. These may be submitted electronically in PDF or CAD format.

☐ Global Risk Consultants reviews the roofing contractor's submittals. The FM Global application for acceptance of roofing system with the RoofNav number is required as the cover sheet.

☐ Global Risk Consultants reviews store fixture plans.

☐ Global Risk Consultants reviews the sprinkler contractor's submittals (shop dwgs, hydraulic calculations, seismic calculations and catalog cut sheets). At least two hard copies of the shop drawings are required, however the hydraulic calculations, catalog cut sheets and seismic bracing calculations (if required) may be submitted electronically in PDF format. Fire pump installation information and drawing should be included if a pump will be part of the construction project.

FM Global Data Sheets are available for FREE at: http://www.fmglobal.com/fmglobalregistration/

FM Global RoofNav Tools and Support information is available for FREE at: www.RoofNav.com

FM Global Approval Guide is available for FREE at: http://www.fmglobal.com/page.aspx?id=50000000

| Approval Standard | Title | Month Issued |
|---|---|---|
| 4431 | Approval Standard for Skylights | 9/2006 |
| 4435 | Roof Perimeter Flashing | 8/2004 |
| 4450 | Approval Standard for Class 1 Insulated Steel Deck Roofs | 2/1989 |
| 4451 | Approval Standard for Profiled Steel Panels for Use as Decking in Class 1 Insulated Roof Construction | 6/2012 |
| 4454 | Approval Standard for Lightweight Insulating Concrete for Use in Class 1 and NonCombustible Roof Constructions | 5/2010 |
| 4470 | Single-Ply, Polymer-Modified Bitumen Sheet, Built-Up Roof (BUR) and Liquid Applied Roof Assemblies for use in Class 1 and Noncombustible Roof Deck Construction | 6/2012 |
| 4471 | Approval Standard for Class I Panel Roofs | 3/2010 |
| 4475 | Approval Standard for Class 1 Steep Slope Roof Covers | 9/2006 |
| 4476 | Approval Standard for Flexible Photovoltaic Modules | 1/2011 |
| 4477 | Approval Standard for Vegetative Roof Systems | 6/2010 |
| 4478 | Approval Standard for Rigid Photovoltaic Modules | 3/2012 |

**Global Risk Consultants**

**SIMON**



*Fig. 3. Hailstorm hazard map for United States (areas subject to damaging hailstorms)*

For further clarification, contact:

Edward R. Nickerson, District Manager, Global Risk Consultants
Tel:     630-999-1734
Email:   Edward.Nickerson@tuvsud.com

**EXHIBIT E**
**SAMPLE APPLICATION FOR PAYMENT, LIEN WAIVER FORMS,**
**AND CONTRACTOR'S AFFIDAVIT**
**(attached)**

# APPLICATION AND CERTIFICATE FOR PAYMENT

| | | | |
|---|---|---|---|
| TO OWNER: SHOPPING CENTER ASSOCIATES | PROJECT: Menlo Park - Macaroni Grill Pad | APPLICATION NO.: | APPL1 |
| | | PROJECT NOS.: | 04666 |
| FROM CONTRACTOR: Scungio Borst and Associates | ARCHITECT: | APPLICATION DATE: | |
| ADDRESS: 2 Riverside Drive, Suite 500 Camden, New Jersey 08103 | | CONTRACT DATE: | 4/7/2021 |
| CONTRACT FOR: Scungio Borst & Associates - GC-2 $3,596,101 | | | |

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
Continuation Sheet is attached.

| | |
|---|---|
| 1. **ORIGINAL CONTRACT SUM** | $3,596,101.00 |
| 2. **Net change by Change Orders** | $0.00 |
| 3. **CONTRACT SUM TO DATE** (Line 1 ± 2) | $3,596,101.00 |
| 4. **TOTAL COMPLETED & STORED TO DATE** (Column N on G703) | $0.00 |
| 5. **RETAINAGE** | |
| Total Retainage (Column Q of G703) | $0.00 |
| 6. **TOTAL EARNED LESS RETAINAGE** | $0.00 |
| 7. **LESS PREVIOUS CERTIFICATES FOR PAYMENT** (Line 6 from prior Certificate) | $0.00 |
| 8. **CURRENT PAYMENT DUE** | $0.00 |
| 9. **BALANCE TO FINISH, INCLUDING RETAINAGE** (Line 3 less Line 6) | $3,596,101.00 |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR:

By: _____   Date: _____

State of:
County of:
Subscribed and sworn to before me this ____ day of _____ 20__

Notary Public: _____

My Commission expires: _____

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED . . . . . . . . . . $
(Attach explanation if amount certified differs from the amount applied for. Initial all figures on this Application and on the Continuation Sheet that are changed to conform to the amount certified.)

ARCHITECT:
By: _____   Date: _____
This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

PROJECT NAME: Menlo Park - Macaroni Grill Pad

| Line Item Number | SCG Business Unit | SCG Cost Code | Cost Code Description | Item Description or Notes | Org. Bud. Scheduled Value | SOV Changes (This Period (GMP only) | SOV Changes To Date | Change Orders | Work Completed & Stored Mat. Pro. Appl. | VENDOR APPL / INV DATE: Work Completed Current Period | Stored Materials Current Period | Retainage Requested | Total Comp. & Stored to Date (J+K+L) | % N/I (F+G+H+I) | Balance To Finish (F+G+H+I)H | Retainage |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 001 | 46665257 / Sitework | 302050 | Demolition - On-Site | Demolition | $54,250.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $54,250.00 | $0.00 |
| 002 | 46665257 / Sitework | 302210 | Grading Fine - On-Site | Earthwork | $119,505.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $119,505.00 | $0.00 |
| 003 | 46665257 / Sitework | 302500 | Concrete Paving - On-Site | Paving & Surfacing | $536,940.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $536,940.00 | $0.00 |
| 004 | 46665257 / Sitework | 302660 | Water Distribution - On-Site | Water Distribution | $38,650.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $38,650.00 | $0.00 |
| 005 | 46665257 / Sitework | 302720 | Storm Sewage Systems - On-Site | Storm Sewer | $417,793.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $417,793.00 | $0.00 |
| 006 | 46665257 / Sitework | 302730 | Sanitary Sewage Systems - On-Site | Sanitary Sewer | $87,001.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $87,001.00 | $0.00 |
| 007 | 46665257 / Sitework | 302785 | Elect Power - On-Site | Electric Power Transmission | $62,051.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $62,051.00 | $0.00 |
| 008 | 46665257 / Sitework | 302810 | Irrigation Systems - On-Site | Irrigation System | $36,430.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $36,430.00 | $0.00 |
| 009 | 46665257 / Sitework | 302900 | Landscaping - On-Site | Landscaping | $52,220.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $52,220.00 | $0.00 |
| 010 | 46665256 / Shell Construction | 403001 | Concrete - Building | Concrete | $146,940.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $146,940.00 | $0.00 |
| 011 | 46665256 / Shell Construction | 404001 | Masonry | Masonry | $86,380.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $86,380.00 | $0.00 |
| 012 | 46665256 / Shell Construction | 405120 | Metal, Structural Steel | Structural Steel | $449,201.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $449,201.00 | $0.00 |
| 013 | 46665256 / Shell Construction | 407210 | Insulation, Building | Insulation | $29,510.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $29,510.00 | $0.00 |
| 014 | 46665256 / Shell Construction | 407510 | Roofing, Built-Up Bituminous | Roofing Membrane | $168,571.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $168,571.00 | $0.00 |
| 015 | 46665256 / Shell Construction | 407610 | Roofing, Sheet Metal | Sheet Metal | $139,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $139,000.00 | $0.00 |
| 016 | 46665256 / Shell Construction | 407900 | Roofing, Joint Sealers | Joint Sealers | $4,800.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $4,800.00 | $0.00 |
| 017 | 46665256 / Shell Construction | 408400 | Entrances and Storefronts | Entrances & Storefronts | $142,825.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $142,825.00 | $0.00 |
| 018 | 46665256 / Shell Construction | 409910 | Finishes, Painting, Exterior | Ext Painting | $368,239.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $368,239.00 | $0.00 |
| 019 | 46665256 / Shell Construction | 415300 | Mech, Fire Protection | Fire Protection | $35,000.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $35,000.00 | $0.00 |
| 020 | 46665256 / Shell Construction | 415400 | Mech, Plumbing | Plumbing | $97,070.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $97,070.00 | $0.00 |
| 021 | 46665256 / Shell Construction | 415500 | HVAC | HVAC | $6,122.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $6,122.00 | $0.00 |
| 022 | 46665256 / Shell Construction | 416001 | Electrical - Building | Electrical | $148,700.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $148,700.00 | $0.00 |
| 023 | 46665256 / Shell Construction | 101510 | General Const Costs | General Conditions | $194,934.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $194,934.00 | $0.00 |
| 024 | 46665256 / Shell Construction | 101155 | Insurance-Liability | Liability Insurance | $35,872.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $35,872.00 | $0.00 |
| 025 | 46665256 / Shell Construction | 101150 | Insurance-Builder's Risk | Builder's Risk | $9,891.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $9,891.00 | $0.00 |
| 026 | 46665256 / Shell Construction | 518921 | GC-Overhead and Profit, Commit - External | GC Fee | $128,206.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $128,206.00 | $0.00 |
| | | | | Total of Display Items Only | $3,596,101.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | | $3,596,101.00 | $0.00 |
| | | | | TOTALS | $3,596,101.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | $0.00 | 0.00% | $3,596,101.00 | $0.00 |



Draft
4/8/2021

## INTERIM CONDITIONAL WAIVER AND RELEASE OF LIENS AND CLAIMS UPON PAYMENT – GENERAL CONTRACTOR

STATE OF_____
COUNTY OF_____

The undersigned, _____, of _____
("Company") who has furnished certain materials, equipment, services, and/or labor for the project known as _____
_____ ("Project"), which is located within the City of _____
_____ ("Site City"), County of_____ ("Property"), and is owned by
_____ ("Owner"), and more particularly described as follows:

_____

(Site Address)

_____

(Site City, State, Zip Code)

(DESCRIBE THE PROPERTY UPON WHICH THE IMPROVEMENTS WERE MADE BY USING EITHER A METES AND BOUNDS DESCRIPTION, THE LAND LOT DISTRICT, BLOCK AND LOT NUMBER, OR THE STREET ADDRESS OF THE PROJECT.)

Upon receipt of the sum of $_____ ("Current Payment") for Payment Request No. _____, the Company waives and releases any and all liens or claims of liens and all claims, demands, actions, causes of action or other rights against the Owner and the Property or any right against any labor and/or material payment bond it has or may have through the date of _____, 20___, ("Current Date") and reserving those rights and liens that the Company might have in any retainage on account of materials, equipment, services and/or labor furnished by the undersigned to or on account of the Owner or any other person or entity for the Project.

The Company acknowledges that this Waiver and Release is given to induce the payment recited above, and that this Waiver and Release is in substantial conformance with the requirements of applicable law.

Applicable to Payment Request(s) No._____
(or) Invoice(s) No._____

Given under hand and seal this _____ day of _____, 20_____.

_____

Company

Signed_____(SEAL)

By:_____

Title_____

Before me the undersigned, a Notary Public for _____ County, State of _____,
personally appeared _____, and acknowledged the execution of this
instrument this ____ day of _____, 20____.

_____

_____          (Seal)
Notary Public

## INTERIM UNCONDITIONAL WAIVER AND RELEASE OF LIENS AND CLAIMS
## UPON PAYMENT – GENERAL CONTRACTOR

STATE OF_____
COUNTY OF_____

The undersigned, _____, of _____
("Company") who has furnished certain materials, equipment, services, and/or labor for the project known as _____
_____ ("Project"), which is located within the City of _____
_____ ("Site City"), County of _____ ("Property"), and is owned by
_____ ("Owner"), and more particularly described as follows:

_____

(Site Address)

_____

(Site City, State, Zip Code)

(DESCRIBE THE PROPERTY UPON WHICH THE IMPROVEMENTS WERE MADE BY USING EITHER A METES AND BOUNDS DESCRIPTION, THE LAND LOT DISTRICT, BLOCK
AND LOT NUMBER, OR THE STREET ADDRESS OF THE PROJECT.)

Having received the sum of $_____ for Payment Request No. ____, the Company
unconditionally waives and releases any and all liens or claims of liens and all claims, demands, actions, causes of
action or other rights against the Owner and the Property or any right against any labor and/or material payment
bond it has or may have through the date of _____, 20____, and reserving those rights and liens that
the Company might have in any retainage on account of materials, equipment, services and/or labor furnished by the
undersigned to or on account of the Owner or any other person or entity for the Project.

The Company acknowledges that this Waiver and Release in substantial conformance with the requirements of
applicable law.

Given under hand and seal this _____ day of _____, 20____.

_____

Company

Signed_____(SEAL)

By:_____

Title_____

Before me the undersigned, a Notary Public for _____ County, State of _____,
personally appeared _____, and acknowledged the execution of this
instrument this ____ day of_____, 20____.

_____                        (Seal)
Notary Public

# INTERIM CONDITIONAL WAIVER AND RELEASE OF LIENS AND CLAIMS UPON PAYMENT - SUBCONTRACTOR

STATE OF_____

COUNTY OF_____

The undersigned, _____, of _____ ("Company") who has furnished certain materials, equipment, services, and/or labor for the project known as _____ _____ ("Project"), which is located within the City of _____ _____ ("Site City"), County of _____ ("Property"), and is owned by _____ ("Owner"), and more particularly described as follows:

_____

(Site Address)

_____

(Site City, State, Zip Code)

(DESCRIBE THE PROPERTY UPON WHICH THE IMPROVEMENTS WERE MADE BY USING EITHER A METES AND BOUNDS DESCRIPTION, THE LAND LOT DISTRICT, BLOCK AND LOT NUMBER, OR THE STREET ADDRESS OF THE PROJECT.)

Upon receipt of the sum of $_____ ("Current Payment") for Payment Request No. _____, the Company waives and releases any and all liens or claims of liens and all claims, demands, actions, causes of action or other rights against the Owner and the Property or any right against any labor and/or material payment bond it has or may have through the date of _____ , 20_____, ("Current Date") and reserving those rights and liens that the Company might have in any retainage on account of materials, equipment, services and/or labor furnished by the undersigned to or on account of the Owner or any other person or entity for the Project.

The Company acknowledges that this Waiver and Release is given to induce the payment recited above, and that this Waiver and Release is in substantial conformance with the requirements of applicable law.

Applicable to Payment Request(s) No._____
(or) Invoice(s) No._____

Given under hand and seal this _____ day of _____, 20_____.

_____

Company

Signed_____(SEAL)

By:_____

Title_____

Before me the undersigned, a Notary Public for _____ County, State of _____, personally appeared _____, and acknowledged the execution of this instrument this ___ day of_____, 20___.

_____                                            (Seal)

Notary Public

## INTERIM UNCONDITIONAL WAIVER AND RELEASE OF LIENS AND CLAIMS
## UPON PAYMENT - SUBCONTRACTOR

STATE OF_____

COUNTY OF_____

The undersigned, _____, of _____
("Company") who has furnished certain materials, equipment, services, and/or labor for the project known as _____
_____ ("Project"), which is located within the City of _____
_____ ("Site City"), County of_____ ("Property"), and is owned by
_____ ("Owner"), and more particularly described as follows:

_____
(Site Address)

_____
(Site City, State, Zip Code)

(DESCRIBE THE PROPERTY UPON WHICH THE IMPROVEMENTS WERE MADE BY USING EITHER A METES AND BOUNDS DESCRIPTION, THE LAND LOT DISTRICT, BLOCK
AND LOT NUMBER, OR THE STREET ADDRESS OF THE PROJECT.)

Having received the sum of $_____ for Payment Request No. ____, the Company
unconditionally waives and releases any and all liens or claims of liens and all claims, demands, actions, causes of
action or other rights against the Owner and the Property or any right against any labor and/or material payment
bond it has or may have through the date of _____, 20____, and reserving those rights and liens that
the Company might have in any retainage on account of materials, equipment, services and/or labor furnished by the
undersigned to or on account of the Owner or any other person or entity for the Project.

The Company acknowledges that this Waiver and Release in substantial conformance with the requirements of
applicable law.

Given under hand and seal this _____ day of _____, 20____.

_____

Company

Signed_____(SEAL)

By:_____

Title_____

Before me the undersigned, a Notary Public for _____ County, State of _____,
personally appeared _____, and acknowledged the execution of this
instrument this ____ day of _____, 20___.

_____
Notary Public

(Seal)

# FINAL CONDITIONAL WAIVER AND RELEASE OF LIENS AND CLAIMS UPON PAYMENT

STATE OF_____

COUNTY OF_____

The undersigned, _____, of _____
("Company") who has furnished certain materials, equipment, services, and/or labor for the project known as _____
_____("Project"), which is located within the City of _____
("Site City"), County of _____ ("Property"), and is owned by _____
("Owner"), and more particularly described as follows:

_____
(Site Address)

_____
(Site City, State, Zip Code)

(DESCRIBE THE PROPERTY UPON WHICH THE IMPROVEMENTS WERE MADE BY USING EITHER A METES AND BOUNDS DESCRIPTION,
THE LAND LOT DISTRICT, BLOCK AND LOT NUMBER, OR THE STREET ADDRESS OF THE PROJECT.)

Upon receipt of the sum of $_____, the Company waives and releases any and all claims, demands, actions, causes of action or other rights against the Owner and the Property, at law, under a contract, in tort, equity or otherwise, and any and all liens or claims of liens or any right against any labor and/or material payment bond it has, may have had or may have in the future upon the foregoing described Property or in relation to the Company's performance of work on or the furnishing of equipment, services, and/or labor for the Project.

This Waiver and Release applies to all facts, acts, events, circumstances, changes, constructive or actual delays, accelerations, extra work, disruptions, interferences and the like which have occurred, or may be claimed to have occurred prior to the date of this Waiver and Release, whether or not known to the Company at the time of execution of this Waiver and Release.

The Company acknowledges that this Waiver and Release is in substantial conformity with the requirements of applicable law and shall be binding and conclusive against the Company for all purposes, subject only to payment in full of the amount set forth above.

Given under hand and seal this _____ day of _____, 20_____.

_____
Company

Signed_____(SEAL)

By:_____

Title_____

Before me the undersigned, a Notary Public for _____ County, State of _____, personally appeared _____, and acknowledged the execution of this instrument this ____ day of _____, 20___.

_____          (Seal)
Notary Public

Form SPG-9 ("Vendor Name") ("2020.03.17")          1

## CONTRACTOR'S AFFIDAVIT

STATE OF      _____      )
COUNTY OF    _____      )

TO WHOM IT MAY CONCERN:

The undersigned, being duly sworn, deposes and says that he is _____ of the _____ who is the contractor for the _____ work on the building located at _____ _____ and owned by _____. That the total amount of the contract including extras is: $_____ of which he has received payment of $_____ prior to this payment.

That the following are the names of the parties who have furnished material or labor, or both, for said work and all parties having contracts or subcontracts for specific portions of said work or for material entering into the construction thereof and the amount due or to become due to each, and that the items mentioned include all labor and material required to complete said work according to plans and specifications.

| Name | Service Rendered | Contract Price | Amount Paid | This Payment | Balance Due |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
| Total labor and material to complete |  |  |  |  |  |

Signed this _____ day of _____, 20___.

By:_____

STATE OF      _____      )
COUNTY OF    _____      )

Before me, the undersigned, a Notary Public in and for said County and State, on this day personally appeared _____ known to me to be the person and officer whose name is subscribed to the foregoing instrument, and acknowledged to me that the same was the act of said _____ and that he executed the same as the act of such _____ for the purpose and consideration therein expressed, and in the capacity therein stated.

GIVEN UNDER MY HAND AND SEAL OF OFFICE, on the _____ day of _____, 20_____.

_____
Notary Public